## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF ERRORS

OF THE

## STATE OF CONNECTICUT.

CALLENDER *against* COLEGROVE:

### IN ERROR.

Where a committee in chancery, on a bill charging a combination between the defendant and others, to defraud the plaintiff in the sale of a mercantile concern, without finding any fraudulent intent, stated in their report, a train of circumstances brought about by the management of the defendant, by which the plaintiff was deceived and injured; and the court adjudged thereon, that the contract of sale was fraudulent and void; on a motion in error by the defendant, it was held, 1. that it was questionable whether this court could review the evidence; 2. that it was competent to the court below to adjudge that the facts found by the committee were sufficient evidence of fraud; 3. that as it appeared from the finding of the committee, that the plaintiff entered into the contract from a mistake as to the real nature of the concern, in consequence of which the substantial object of the contract was defeated, this was a sufficient ground for setting it aside.

Where the delay of the plaintiff to seek relief, was occasioned, in part at least, by the promise of the defendant to rectify the errors complained of; the existence of such errors came to the knowledge of the plaintiff gradually; and the circumstances of the case were such that the defendant could suffer nothing by the delay; it was held, that the plaintiff was not precluded from relief, on the ground of his not having sought it within a reasonable time.

Where the plaintiff, some time after the sale, under the terrors of threatened attachments then impending, by the advice of the officer, and on a promise of the defendant to make all right, executed mortgages to the defendant to secure the purchase money, and it did not appear that the plaintiff then had full knowledge of the errors; it was held, 1. that whether there was a waiver of the plaintiff's right to relief, was a question of *fact*, which ought to appear distinctly on the record; 2. that if the question were open here, the fact relied on, did not, under the circumstances, amount to a waiver.

VOL. XVII.                    1

*Hartford,*
*June 1845.*

Callender
*v.*
Colegrove.

Where contracts are entered into as auxiliary to a former contract between the same parties, and merely to secure its performance, if the principal contract be set aside, the others must fall with it.

Where an instrument bipartite, purporting to be an assignment of all the plaintiff's right in certain goods and debts, to the defendant, with general releases and stipulations on both sides, was signed by the plaintiff and defendant, and was, by mutual consent, left in the hands of a third person;—for what purpose did not distinctly appear;—there was, at this time, no giving up of notes or adjustment of accounts; and the next day, the plaintiff went to the depositary, and forbade his giving up the instrument to the defendant, claiming that it was no settlement; it was held, that these facts did not shew a delivery of the instrument.

The answer of the defendant to a bill in chancery, not found to be true, by the committee or the court, is no evidence, in the court above, of the facts stated in such answer.

Where the plaintiff had purchased, but had not paid for, certain goods for a store occupied by him, which goods, the defendant had the benefit of; and the court decreed, that the defendant should indemnify the plaintiff against the claims of the creditors for such goods; it was held, that this decree was correct, doing entire justice to all parties.

Where it appeared to the committee, in taking the account between the parties, that the plaintiff had, without consideration and at the defendant's request, given certain negotiable notes, not specified in the bill, which were outstanding in the defendant's hands; and the committee did not include them in the account, as the plaintiff might not pay them, but reported the facts; and the court thereupon decreed, that the defendant should indemnify the plaintiff against such notes; it was held, 1. that if the giving of these notes constituted a distinct transaction, the decree was not correct; but 2. as they were exhibited before the committee in taking the account, and no objection was then made on the ground of their belonging to a distinct transaction, they may well be considered as part of the plaintiff's claim in the account; and as this course makes an end of the controversy between the parties, and does better justice than would be done, by leaving the matter open for further litigation, the decree ought not, on this account, to be reversed.

In the taking of an account before a committee in chancery, the testimony of the parties and their account books, are admissible in evidence.

Where the report of a committee in chancery is found to be incorrect in part, the court may recommit it as to that part, and establish it as to the residue.

*Stephen Colegrove* brought his bill in chancery to the superior court against *Ralph Callender* and others, charging a combination to defraud him in the sale of certain goods to him, and praying that certain instruments set forth in the bill, might be set aside, and an account taken. By an amendment, it was averred, that the facts charged in the bill to be fraudulent, if not fraudulent, were matters of mistake between the parties.

It is not necessary here to state the allegations of the bill more particularly, except in relation to an instrument, purpor-

ting to be a discharge, dated the 29th of *January* 1842, and signed by the parties. As to this instrument the bill averred, that though it was signed by the plaintiff and *Callender*, it had never been delivered by the parties thereto ; that at the time it was signed, it was left in the hands of *Edward Goodman* Esq., by whom it had been drawn, at the instance of *Callender*, with the explicit understanding of the parties thereto, that it should not be delivered without the mutual consent of both parties being first expressed to said *Goodman*, and that until such consent and delivery, it was to have no force or effect ; that the plaintiff has never consented to the delivery of said instrument ; but that, on the contrary, a few days after it was signed, he expressly forbade said *Goodman* to deliver it.

*Hartford,*
June, 1845.

Callender
*v.*
Colegrove.

To this bill *Callender* and the other defendants filed their several answers. In *Callender's* answer, it was averred, that the instrument of the 29th of *January*, between him and the plaintiff, was to be a full and final settlement of all their affairs, and was so believed by him to be, when he executed the same, and he believed the plaintiff so considered it.

The superior court appointed a committee, to enquire into the facts alleged in the bill and the matters set forth in the several answers of the defendants, and to make their report thereon. This committee found the following facts.

In the month of *April* 1840, *John R. Sears,* named in the bill, commenced the business of a grocer and dealer in merchandize, in a store situated in *Front* street, near the head of *Ferry* street, in the city of *Hartford* ; which business he continued, at that store, until some time in the month of *June,* 1841. *Ralph Callender,* one of the defendants, put into said business the sum of 1500 dollars, expecting that *Sears* would put in an equal sum ; but he never did in fact put any thing into said concern.

In the month of *April,* 1841, a year from the time said *Sears* commenced business in said store, an inventory was taken of the assets and liabilities of said concern, from which it appeared, that there was then a loss or deficiency of 250 or 300 dollars on the business since its commencement as aforesaid. During the period above mentioned, said business was conducted in the name of said *Sears*. *Richard Shepard,* named in the plaintiff's bill, was, during the whole of said

period, and afterwards, a clerk or agent in said store, employed by the owners of the goods to assist in transacting the business of said store ; but he contributed nothing to the capital stock of said business, and had no interest therein, except as he was thereby furnished with employment in the capacity of clerk or agent as aforesaid ; and the prospect of obtaining something from him on an old claim in consequence of such employment, constituted, in the mind of a creditor of his, the inducement in part to lend to said *Ralph Callender*, said sum of 1500 dollars, as aforesaid, by him put into said concern. In the month of *June*, 1841, all the right, title and interest in said concern, was, by said *Sears*, the ostensible owner thereof, transferred to and vested in *Reuben A. Chapman*, named in the plaintiff's bill, for the use and benefit of said *Ralph Callender ;* the said *Chapman* being hired by said *R. Callender*, for one year from the 9th of *June*, 1841 ; and said *Sears* thereupon ceased to have any connexion with said concern.

At the time of the transfer, another inventory of the assets and liabilities of said concern was taken, which showed, that the concern then stood about the same as it did when the aforesaid inventory in *April* was taken. Another inventory was taken by said *Chapman*, on the last of *August* and 1st of *September*, 1841, which he meant should be accurate, and which showed a gain of between 600 and 800 dollars. But the committee, from a view of the whole evidence in the case, were not satisfied that such gain was in fact made. The amount of goods specified in said last-mentioned inventory was 3431 dollars, 47 cents, taken at cost, and the amount of credits, or debts in favour of the concern, was 5465 dollars, 79 cents, including the amount against *R. & L. Callender.*

In *July*, 1841, the plaintiff said to said *Shepard*, who was still in said store in the capacity aforesaid, that he (*Colegrove*) was sorry that he did not know that said *Sears* wanted to *sell out*, or was going out of said concern. The latter part of *September* following, said *Shepard* mentioned this remark of *Colegrove* to said *Callender*, to which the latter replied, that he did not know but that *Colegrove* would be a good man. Then *Shepard* went to *Colegrove*, and told him the concern in question was for sale, and advised him to see *Callender* on

the subject. The next evening, *Colegrove* went with *Shepard* to see *Callender*, who informed him what his terms were. *Colegrove* replied, that he did not know anything about the concern; he would look into it, and see how it stood. Shortly afterward, *Colegrove* went with *Callender* to said store, and was there some time, looking into the books, examining the goods, &c.

*Hartford,*
*June,* 1841,

Callender
*v.*
Colegrove.

He also made enquiries of *Callender*, of *Chapman*, and of *Shepard*, regarding the state of the accounts. *Callender* gave him to understand, that the books were pretty nearly correct; so far as he knew about them, they were so. He observed that some few of the accounts were bad, but not to any great amount. To *Colegrove's* enquiry about the accounts, *Chapman* replied, that some of them were good, and some of them were bad. *Shepard*, after remarking that he did not keep the books, gave *Colegrove* to understand, that they were very nearly correct. Something was said by *Colegrove* about buying the goods, without having anything to do with the debts. To this *Callender* replied, that if he sold, he should sell the concern as it was; *Colegrove* might satisfy himself. It was nearly three weeks before *Colegrove* made up his mind to take the concern.

On the evening of the 10th day of *November*, 1841, *Callender* and *Colegrove* entered into and subscribed a written agreement, bipartite, drawn by *Chapman*, of which the following is a copy: " This agreement, made this 10th day of *November*, 1841, between *Ralph Callender*, of the first part, and *Stephen Colegrove*, of the second part, witnesseth, that the said *Callender* does bargin and agree, to sell to said *Colegrove*, all of his interest, right and title in the store, consisting of the goods now in the store, now occupied by *R. A. Chapman*, situated on the corner of *Front* and *Ferry* streets; also the goods in the store occupied by *A. Denslow*, owned by me; also the book accounts, notes, and receipts for goods and cash belonging to me in said business; also, the lease of said store and yard, insurance policy, and the fixtures in and about said store; in and for the consideration that the said *Colegrove*, of the second part, does bargain and agree to pay and settle all of the notes and accounts due, and becoming due, against *R. A. Chapman* and *J. R, Sears*, belonging to the business of said store.

*Hartford,*
*June, 1845.*

Callender
*v.*
Colegrove.

In witness whereof, we hereunto set our hands and seals, on this 10th day of *November*, 1841.

*Ralph Callender,*
*Stephen Colegrove."*

*Colegrove* asked for the lease of the store, and the policy of insurance, which *Callender* said were then at said *Chapman's* house, but should be brought to his (*Callender's*) store, in the morning, and there remain with the other papers, until the policy could be regularly assigned. They were accordingly so brought and left.

In the morning, *Colegrove* requested *Shepard*, who still remained in said store, but without any specific agreement with *Colegrove* to pay him for his services, to open said store; and *Colegrove* thereafter conducted the business of said store as his own. The connexion of said *Chapman* with the concern, was, at the same time, terminated; and *Colegrove* gave him his (*C's*) note, for the balance due him from *Callender* for his past services; which note, however, *Colegrove* failed to pay, when it became due. No inventory was taken, when *Colegrove* went into the concern; but in the opinion of said *Shepard*, the stock of goods did not differ much from that inventoried on the 1st of *September* preceding; and said *Chapman* supposed, from the inventory taken at that time, that the store could pay its debts. It was proved to the committee, by the testimony of *Richard Shepard*, that when *Callender* offered said concern to *Colegrove*, previous to the 10th of *November*, 1841, the terms proposed by said *Callender*, were, that he (*Colegrove*) should take the concern as it was,—should have the goods and effects belonging to it, and the debts due to it, and should pay to *Callender* the capital by him put into the concern, and to the creditors of the concern the debts due to them respectively from the concern. This testimony was objected to, by the plaintiff's counsel, on the ground that all communication between the parties regarding the terms, was merged in the written agreement of the 10th of *November* 1841, and that no parol evidence was admissible to prove the terms. The committee received said testimony subject to said objection. If it was admissible, the committee found, that such were the terms offered by said *Callender* to said *Colegrove*, at the time referred to.

Some time after *Sears* went out of the concern, and before

*Hartford,*
June, 1845.

Callender
*v.*
Colegrove.

the sale to *Colegrove, Callender* said to *Enos Babcock*, " that *Sears* had looed him out of what he put into the concern." At other times, before *Colegrove* went into the concern, *Callender* said, that " *Sears* kept the books incorrectly—that he kept them so you could tell nothing by them." *Callender* also said, that " he had a good many loafers about him, and he meant to shake them off; that he was going to get rid of the store,—that he had lost money enough." After said *Chapman* came into the concern, he found (as he testified, and the committee found,) that some of the accounts kept by *Sears,* were incorrect; that he (*Chapman*) experienced a good deal of difficulty on account of such incorrectness; that the accounts varied from truth, sometimes one way and sometimes the other. The committee did not find, however, that there was more than one instance wherein the variation was against said concern. In the account with *Levi Lincoln,* there was an error, producing a result less favourable to said concern, by 7 dollars and 25 cents, than it would have been, if no such error had intervened.

In the following instances, the books of said concern, on the 10th of *November,* 1841, showed a greater balance to be due to said concern, than was at that time actually due.

In the account with *Burt, Sears & Co.,* there appeared to be a balance due from that firm to said concern of 82 dollars, 13 cents, whereas there was a balance the other way of 75 dollars, 95 cents.

In the account with *Almanzor Denslow,* the books showed a balance against him in favour of said concern, of 109 dollars, 37 cents, whereas there was a balance of about 40 dollars the other way.

In the account with *Solomon Porter,* the books showed a balance against him in favour of the concern of 27 dollars, 69 cents, whereas there was a balance of 154 dollars, 31 cents, the other way.

In the account with *Solomon Smith,* the books showed a balance against him in favour of said concern of 47 dollars, 66 cents, whereas the balance actually due from said *Smith,* was only 21 dollars, 66 cents; credits to the amount of 26 dollars for horse and carriage hire, which ought to have been given, being omitted on said books.

In the account with *Isaac D. Bull,* the books showed a

Hartford,
June, 1845.

Callender
v.
Colegrove.

balance against him in favour of said concern of 22 dollars, 15 cents; whereas there was a balance of 13 dollars, 38 cents, the other way.

In the account of *James Burt*, the books showed a balance against him in favour of said concern of 27 dollars, 74 cents, whereas such balance had been settled, by a transfer of accounts, which did not appear on said books.

In the account with *Lyman Sears*, the books showed a balance against him, in favour of said concern, of 65 dollars, 40 cents, which balance had been paid to said *Sears*, while he was in said store, and not credited on said books.

Some time after the date of the agreement of the 10th of *November*, *Colegrove* complained to *Callender*, that there was not as much due to said concern as the books showed; to which *Callender* replied, that if any thing fell short, he would make it right.

The committee found, that *Colegrove* was induced to enter into said agreement, principally by the favourable representations of said concern, made to him as aforesaid, by said *Callender*, *Chapman* and *Shepard;* but the committee did not find, that there was any fraudulent combination between said *Callender*, *Chapman* and *Shepard* to deceive and defraud said *Colegrove*.

The committee also found, that *Colegrove* entered into said agreement trusting to the information which he derived from an examination of said books and accounts, and relying on said books and accounts as substantially correct, and without any knowledge that they were otherwise; but the committee did not find, that there was any fraudulent intent on the part of said *Callender*, in relation to said books and accounts and said agreement, except so far as a court of equity may infer fraud from the facts stated in the report.

In relation to said books and accounts, at the the time they were so as aforesaid examined by *Colegrove*, the committee further remarked, that they had been so kept, and were then in such a state, aside from the errors specifically pointed out as aforesaid, that it was difficult for any person not previously acquainted with them, or with the transactions to which they referred, to obtain therefrom any certain information as to the true condition of said concern on the whole. Neither was the evidence adduced on the hearing before the committee of

such a nature as to enable them to determine, with any definiteness, what the true condition of said concern was, at the time referred to.

On the evening of the execution of the agreement of the 10th of *November* 1841, and immediately thereafter, *Colegrove* made and delivered to *Callender*, nineteen promissory notes, amounting to 2920 dollars, 45 cents, a schedule of which was annexed to the report of the committee. Of these notes, six, amounting to 1280 dollars, 6 cents, were indorsed by *R. & L. Callender*, and negotiated; three of them, amounting to 682 dollars, 45 cents, were payable to and indorsed by *C. Sigourney & Son*. None of these notes have been paid by *Colegrove*. Two other notes, amounting to 250 dollars, or about that sum, payable to *R. & L. Callender*, were also given by *Colegrove* to *R. Callender*, at the same time, and as part of the same transaction; which notes *Colegrove* paid when due.

Both parts or duplicates of said agreement of the 10th of *November*, were taken and held by *Callender*; and while the same were in his hands, *Colegrove* applied to him for one of them, which *Callender* declined giving up.

Some time in the latter part of *December*, 1841, or early in the fore part and before the 14th of *January*, 1842, *Callender* came to *Colegrove's* store in *Market* street, where *Colegrove* then had the books and accounts belonging to said store in *Front* street, and in the absence of *Colegrove*, without leave from him, *Callender* took therefrom said books and accounts, and carried them off to his store in *State* street.

On the 14th of *January* 1842, *Colegrove*, at the request of *Callender*, executed and delivered to him (*Callender*) the following instrument in writing: "This agreement, made this 14th day of *January*, 1842, between *Stephen Colegrove*, of the first part, and *Ralph Callender*, of the second part, witnesseth, that the said *Colegrove* does bargain and agree to sell to said *Callender*, all his interest, right, and title, in the store, consisting of the goods now in the store occupied by said *Colegrove*, situated on the corner of *Front* and *Ferry* streets; also the goods in the store occupied by *A. Denslow*, owned by me; in and for the consideration, that the said *Callender* pay the sum of five hundred dollars, to apply to the

payment of notes that *R. & L. Callender* hold against said *Colegrove.*

" In witness whereof, we hereunto set our hands and seals, on this 14th day of *January*, 1842.

*Stephen Colegrove.* [*L. S.*]
*Ralph Callender.* [*L. S.*]

" The condition of the above obligation is, that whereas the said *Ralph Callender* is obligated and holden for various debts or sums, due from the business of said store, accruing for property received in the business of said store ; now if the said *Colegrove* shall pay or cause to be paid such debts or demands due against said store, accruing for property received in the mercantile business thereof, then this instrument is to be null and void, otherwise to remain in full force and virtue.

*Stephen Colegrove.*
*Ralph Callender.*"

At the same time, and as part of the same transaction, *Colegrove* signed and delivered to *Callender* the following writing : " This is to certify, that I have, this day, assigned to *Ralph Callender* the book accounts and notes belonging to me, that belonged to the store I bought of said *Callender*, in the name of *R. A. Chapman ;* also the business that has been done by me in said store : the said accounts, when collected, to apply in the payment of notes that *R. & L. Callender* hold against me ; also in payment of accounts that are due sundry persons on said books. *Hartford, January* 14th, 1842.

*Stephen Colegrove.*"

At this time, the amount of debts charged on book, due to the *Front* street store, was about 2800 dollars, exclusive of the account against *R. & L. Callender.*

On the 20th of *January* 1842, *Callender* came with *Walter Harris*, then a deputy sheriff, to *Colegrove's* store in *Market* street ; said *Harris* having in his hands a writ of attachment in favour of *R. & L. Callender* against *Colegrove*, dated *January* 14th, 1842, counting on the principal part of the notes so as aforesaid given by *Colegrove*, payable to *R. & L. Callender.* *Callender* then said to *Colegrove*, " you must give me a mortgage of your goods in the *Market* street store ; if you do not, I will have them attached and sold at auction." *Colegrove* exclaimed " what shall I do !" He referred to the previous mortgage, insisting that it was sufficient security, and

*Hartford,*
June, 1845.

Callender
*v,*
Co egrove.

touched upon the errors in the books kept by *Sears* and *Chapman.* *Callender* said, he would make all right ; their accounts could be settled some other day. *Harris* advised *Colegrove* to give the mortgage, observing, as an inducement thereto, that the difficulties about the books could be settled afterwards. *Colegrove* thereupon consented to execute, and did, on the same day, execute, and deliver to *Callender* an instrument, purporting to be a mortgage of all the goods, wares and merchandize belonging to *Colegrove,* and situated in the store occupied by him in *Market* street, together with all the fixtures and other property in and upon the premises ; to have and to hold, and occupy and dispose of the same, and the avails thereof to apply to the payment of *Colegrove's* said notes, and the balance, after deducting all reasonable charges and expenses, to pay over to *Colegrove ;* the condition annexed to this instrument being, that on *Colegrove's* paying said notes according to their tenor, it should be void, but otherwise be in force. At the same time, *Colegrove* leased to *Callender* said *Market* street store, together with the land and all the appurtenances, for the term of three months.

On the 29th of *January* 1842, a written instrument of that date was drawn by *Edward Goodman,* Esq. at the request of *Callender,* of which the following is a copy : "This agreement, made on this, the 29th day of *January,* 1842, by and between *Stephen Colegrove,* of the first part, and *Ralph Callender,* of the second part, witnesseth, that the party of the first part, in consideration of the covenants and agreements, hereinafter expressed, and for the further sum of ten dollars to him in hand paid, by the party of the second part, doth bargain, sell, transfer, assign, and deliver unto the party of the second part, all the right, title and interest, that he hath in and to any and all the goods, wares, and merchandize, in the store on the corner of *Front* and *Ferry* streets, in the city of *Hartford,* and the buildings occupied as a store-house for said store, and on the premises of said store ; also, all the right, title and interest, that he hath in and to any claims, demands, or debts against any person, or persons whomsoever, for goods or property sold from said store ; also, all the right, title and interest, that he hath in and to any, and all the goods, wares, and merchandize, and fixtures, in the store lately occupied by the party of the first part, on *Market* street, in said

city, and on the premises there situated, occupied as a store, or for keeping, or storing goods; also, one horse, wagon, and harness, and one beer wagon. And the party of the first part doth further agree to and with the part of the second part, to discharge him, and the persons composing the firm of *R. &. L. Callender,* from all claims and demands, that he has against them, or against either of them.

"And the party of the second part, in consideration of the covenants and agreements above-mentioned, doth, on his part, covenant and agree to and with the party of the first part, that he will discharge him from all notes, debts, claims and demands, that he, or the firm of *R. &. L. Callender,* have against him; and does hereby release unto the party of the first part, all the right, title and interest, that he has in and to the furniture of the party of the first part, and of any other property, (except what is herein conveyed to the party of the second part,) and that was mortgaged, by the party of the first part, to the party of the second part; and does agree to pay Messrs. *Savage & Co.* the sum of twenty-seven dollars, in part payment of a debt owed them by the party of the first part.

"It is also agreed, by and between the said parties, that all the goods, wares, and merchandize, that are herein conveyed, by the party of the first part, to the party of the second part, and that are in said store on *Market* street, or on said premises, together with the horse, wagon, harness, and beer wagon, shall be appraised, by *Elnathan Beach* and *Reuben A. Chapman;* and if the same, by their appraisal, shall be valued at more than six hundred and sixty-two dollars, then the party of the second part, shall return to the party of the first part, so many of said articles as shall leave the amount that he receives at six hundred and sixty-two dollars, or shall pay him the value of the same at their said appraisal; and if the said property shall, by the appraisal of said persons, be valued at a less sum than six hundred and sixty-two dollars, then the party of the first part shall pay unto the party of second part the difference between the value of said articles by their appraisal, and the sum of six hundred and sixty-two dollars; and the said parties do hereby release and discharge each other from all claims and demands, in this agreement agreed to be discharged and released.

"In witness whereof, we have hereunto set our hands, on the day and year above-mentioned.

Stephen Colegrove,
Ralph Callender."

On the hearing before the committee, the plaintiff claimed, that this instrument was never delivered, and therefore, never took effect. The facts proved and found, were these. After it was drawn and read to the parties, it was signed by them. *Callender* then proposed, that it should be left in the hands of said *Goodman*, to which *Colegrove* assented, and it was left in said *Goodman's* hands accordingly.

What was the intention of the parties in this step, did not distinctly appear. There was no direct proof that the parties contemplated any particular condition to be performed, or event to take place, before the instrument should become effective ; and yet the circumstances of the case furnish a presumption at least, that the contract, at the time it was placed in said *Goodman's* hands, was not considered as consummated. It was an instrument properly bipartite in its nature, signed by both parties, and containing stipulations on the part of each ; and yet no duplicate was signed or drawn ; *Colegrove's* notes to *R. & L. Callender*, were not given up ; nor does there appear to have been any adjustment or liquidation of accounts, except by the terms of the instrument itself.

On *Monday* next after the signing of said instrument, (which was on *Saturday* afternoon,) and while the same remained in the hands of said *Goodman*, *Colegrove* went to said *Goodman's* office and asked to see said instrument, which was produced and read by said *Goodman* ; whereupon *Colegrove* said to *Goodman*, "this is no settlement ;" and forbade his giving it up to *Callender*. *Colegrove* then went down to said store in *Front* street, where *Callender* was, and told him, that he (*Colegrove*) was not going to abide by said instrument as a settlement, alleging that he wanted to settle their accounts. To this *Callender* replied, that they must go into *Market* street, and appraise the goods there, before they could tell how to settle their accounts.

*Callender* has never performed the stipulations in said instrument, by him to be performed, by paying the sum of 27 dollars to *Savage & Co.*, or any part thereof, or by paying to *Colegrove* the excess of the appraised value of said *Market* street goods over 662 dollars, which was 16 dollars, 69 cents.

*Hartford*
*June, 1845.*

*Callender*
*v.*
*Colegrove.*

On the *Monday* morning next following the 29th *January*, 1842, *Reuben A. Chapman* and *Elnathan Beach* were called upon, by *Callender*, to appraise the goods in said store in *Market* street ; and said *Chapman* and *Beach* did accordingly appraise said goods, at what they thought they were worth, *viz.* 678 dollars, 69 cents. *Callender* and *Colegrove* were both present. The goods, when appraised, were taken down to said store in *Front* street, except some hams, coal, &c. which were deducted from the appraisal, leaving the amount as above stated. On or about the 5th of *February*, 1842, *Callender* disposed of the goods and fixtures in said store in *Front* street, to *John Hannaford*, for the sum of 1950 dollars. For about two thirds of the purchase money, amounting to 1300 dollars, said *Hannaford* gave his notes to *Callender*, endorsed by *Stephen R. Robins*. The balance of the purchase money, except a small portion, which was paid at the time in cash, was to remain on book, to be drawn from the store in goods. Immediately on the purchase, said *Hannaford* went into possession of said goods and fixtures, and so remained, selling, in the usual manner, the vendible articles therein, until *July* 1842, when he failed, and made a general assignment of his effects, including said goods, for the benefit of his creditors ; but subsequently made an arrangement with his creditors. and said assignment was never carried into effect.

Soon after the sale to the said *Hannaford*, and before he commenced business in said *Front* street store, *Colegrove* went there and forbade his selling said goods. *Chapman's* sign on said store continued up, down to the sale to said *Hannaford*. *Richard Shepard* continued in said store, in the same capacity as at first, until about a fortnight after the sale to *Hannaford*, under the direction of the ostensible principal for the time being.

The committee have examined into the account between said *Front* street store and *R. & L. Callender*, as it stands upon the books of said store. The account has been kept in an unusual manner. Many of the items are charged directly upon the ledger, without reference to any former entry. Soon after the 14th of *January* 1842, when the parties were getting the items of the account together, with a view to a settlement, sundry credits of cash to *R. & L. Callender*, to the amount of 3,444 dollars, 79 cents, under different dates, in-

*Hartford,*
*June, 1845.*

Callender
*v.*
Colegrove.

cluding interest to *January* 1st, 1842 ; also a balance of bills, not credited, of 765 dollars, 96 cents ; also a credit of cash paid *Driscoll* of 36 dollars, 73 cents, (the two latter without date) were all entered in the hand-writing of *Colegrove*, upon the ledger, from loose scraps of paper. Below these items are entries of credit, in a different hand-writing, one, without date, of 105 dollars, 68 cents, and then, under date of *January* 22d, 1842, sundries amounting to 627 dollars, 14 cents ; then cash, (including the 1500 dollars, the capital furnished by *R. Callender,*)1,935 dollars, 54 cents.

On the other hand, there are charges on said ledger, in the hand-writing of *Colegrove*, to the amount of 1,077 dollars, 14 cents, not previously entered on the day-book, and other charges, in the hand-writing of other persons, to the amount of 1,674 dollars, 66 cents, which, with one exception, appear to have been taken from the day-book.

On the 10th of *November* 1841, the time when *Colegrove* bought out the *Front* street store, the balance upon the books in favour of the concern, against *R. & L. Callender*, was 5,445 dollars, 49 cents ; no entry, at that time, appearing on said books of the 1500 dollars capital, furnished by *R. & L. Callender*. On the 14th of *January* 1842, when the mortgage of that date was given, the balance against *R. & L. Callender* stood at 2,438 dollars, 90 cents ; and up to *January* 29th, the time of signing the aforesaid instrument of that date, the balance against them stood at 1,667 dollars, 76 cents, *R. Callender's* capital of 1,500 dollars having been previously placed in the account, diminishing by that amount the balance against *R. & L. Callender*.

*Colegrove*, while he was in possession of the goods in the *Front* street store, purchased and put into said concern, goods to the amount and of the value of 300 dollars, 89 cents, besides said goods in *Market* street store, and the aforesaid notes given to *R. & L. Callender*, which were paid by *Colegrove*.

In conclusion, the committee, after a careful examination of the books and accounts exhibited to them, in connexion with the other evidence adduced, found, that unless said instrument dated and signed on the 29th of *January*, effected a complete settlement between the parties, and precluded a recovery thereafter, by *Colegrove*, of any balance due to him from *R. Callender*, there was then justly and equitably due

from *R. Callender* to *Colegrove* the sum of 1667 dollars, 26 cents, with interest.

This report being returned to the superior court, at its term in *September* 1843, the defendant *R. Callender* filed his remonstrance against the acceptance thereof, alleging sundry mistakes and errors of computation therein. After hearing the parties, at an adjourned term in *April*, 1844, the court found some of the allegations in the remonstrance true, and referred the cause again to the same committee, to take the account between the parties, but held the exceptions insufficient as a ground of rejecting the report entirely.

The plaintiff and the defendant *R. Callender* again appeared before the committee, and were examined as witnesses under oath, touching the matters in controversy between them. The testimony of sundry other witnesses was also introduced, and the books containing said accounts were examined, together with sundry documents relating thereto.

At the commencement of the hearing, the defendant *R. Callender* objected to the testimony of the plaintiff, and his account books, in relation to the accounts between the parties, claiming that the plaintiff was an incompetent witness in this cause, and that his books were inadmissible as evidence. The committee overruled the objection, and admitted said testimony and books.

On the adjustment of said accounts, the committee found, that there was a balance due thereon from *R. Callender* to the plaintiff, amounting to the sum of 1332 dollars, 26 cents, with interest from the 2nd day of *February*, 1842.

The committee further found, that the plaintiff, while he was in the occupation of the *Front* street store, carrying on the business thereof, ostensibly as principal and owner, purchased supplies of goods for said store, as they were needed, from time to time, which went into said store, and were mixed with the other goods therein, and were dealt with in like manner; which goods so purchased were charged to the plaintiff; and among them were certain goods not included in the aforesaid accounts, which have never been paid for, nor has the plaintiff ever been discharged from his liability therefor, but the following sums are still due on account thereof, to the following persons and firms respectively, *viz.* to *Foster & Co.* 25 dollars, 39 cents; to *Savage & Co.* 6 dollars, 24

cents; to *Hudson & Co.* 26 dollars, 38 cents; to *Solomon Cowles 2nd*, 28 dollars, 27 cents; to *Hurlbut & Howard* 22 dollars—making in the whole 108 dollars, 28 cents.

During the period referred to, the plaintiff purchased, in like manner, other goods for said store, which went into it and were dealt with as aforesaid, for which he gave his notes or due-bills to the several vendors, which have never been paid, but are still outstanding against the plaintiff; the following sums being due on such notes or due-bills to the following persons respectively, [describing them] amounting to 121 dollars, 5 cents.

During the same period, the plaintiff purchased, in like manner, other goods for said store, which went into it and were dealt with as aforesaid, for which the several creditors have brought suits and have recovered judgments against the plaintiff; which judgments are still unsatisfied; the following sums being due thereon to the following persons respectively, *viz.* to *J. C. Burdick* 17 dollars, 50 cents, and to *Elisha Peck* 21 dollars, 12 cents, amounting to 38 dollars, 62 cents.

During the same period, the plaintiff, at the request of the defendant *R. Callender,* and without any valuable consideration received by the plaintiff, made and delivered three promissory notes; one for 400 dollars, dated *November* 5th, 1841, payable to *R. & L. Callender,* or order, 95 days after date; another for 500 dollars, bearing the same date, payable to *R. & L. Callender,* or order, four months after date; and another for 178 dollars, 67 cents, payable to *Fredrick Porter,* or order, four months after date; all of which notes remain outstanding against the plaintiff, undischarged and unsatisfied with respect to him.

In the course of the hearing, the defendant *R. Callender,* by his counsel, claimed, that the plaintiff was liable to account to said *R. Callender* for all the goods of said *R. Callender* which came into the plaintiff's hands, at the true and just value thereof, at the time the plaintiff received the same; and if the plaintiff sold them out, or any part thereof, on credit, and the purchasers failed to make payment, in consequence of which the goods were lost, such loss ought to be borne by the plaintiff. The plaintiff, on the other hand, claimed that the contract under which he received said goods being invalid, he became a trustee or agent of said *R. Callender,* and if he

Hartford,
June, 1845.

Callender
v.
Colegrove.

acted with good faith and with ordinary prudence in disposing of the goods, he is not liable for any losses by bad debts.

The committee, however, had no occasion to decide, and did not decide these questions, because there was no evidence before them, showing, with reasonable certainty, what bad debts were thus made, or that there was any want of good faith or ordinary prudence in the management of the plaintiff; and no deduction from the plaintiff's claim was made on account of any such bad debts. The committee found, that the goods so disposed of by the plaintiff were generally sold at a profit on the cost thereof, the benefit of which went to said *R. Callender*, by the course adopted by the committee in taking the account.

This report was returned to an adjourned term of the superior court in *June* 1844, when the defendant *R. Callender* remonstrated against its acceptance. The court, after hearing the parties on such remonstrance, found the facts stated therein to be untrue, except so far as they were consistent with the facts found in the report; and thereupon, the court overruled the remonstrance and accepted the report. The court also found the facts stated in both reports to be true, except those relating to the account in the first report; and thereupon decreed, that the pretended contract or instrument in writing, alleged in the bill to have been executed by and between the plaintiff and said *R. Callender*, in *November* 1841, was fraudulent and void; and that the several other contracts or instruments in writing, alleged in the bill to have been executed by and between these parties, were invalid and of no force or obligation. The court, therefore, set them all aside, and enjoined the defendant *R. Callender* and his agents from ever proceeding thereon against the plaintiff. The court also decreed, under a penalty of 2000 dollars, that *R. Callender* should pay to the plaintiff the sum found due to him, by the committee, in their second report, with costs of suit; that he should procure and deliver to the plaintiff sufficient discharges or indemnities, to the acceptance of the court, from or against the several sums found by the committee to be due from the plaintiff, on account, to sundry persons, for goods purchased by him for the *Front* street store; also from or against the several sums found by the committee to be due from the plaintiff to sundry persons, by notes or due-bills;

*Hartford,*
June, 1845.

Callender
*v.*
Colegrove.

and also from or against the judgments recovered in said suits against the plaintiff, as stated by the committee. The other defendants were, by consent of parties, dismissed, without costs.

*R. Callender,* by motion in error, brought the record before this court for revision, assigning for error,

1. The general error, that the court rendered judgment in favour of the plaintiff, whereas it ought to have rendered judgment in favour of the defendant.

2. That the court adjudged, from the facts alleged in the bill, and found by the committee to be true, that the contract of *November* 10th, 1841, was fraudulent and void, and decreed that it should be set aside.

3. That the court decided, from the facts alleged in the bill, and found by the committee to be true, all the other instruments in writing executed between *Callender* and *Colegrove,* were invalid, and decreed that they should be set aside.

4. That the court enjoined *Callender* and his agents from enforcing such instruments.

5. That the court rejected entirely the first report, upon the facts stated in the remonstrance thereto, and proved to be true.

6. That the court adjudged, that the instrument referred to in the first report, dated *January* 29th, 1842, was not valid, and did not effect a settlement between the parties.

7. That the court decided, that the testimony of the plaintiff and his books, were admissible evidence on the hearing before the committee.

8. That the court decided, that *Colegrove* was not liable to account with *Callender* for all the goods received by the former of the latter, at the true and just value thereof, at the time he received them.

9. That the court decided, that if *Colegrove* sold out, on credit, any part of the goods received by him of *Callender,* or by him purchased for said store, and the purchasers failed to make payment for them, in consequence of which they were lost, *Colegrove* was not liable for such loss.

10. That the court did not decide, that *Colegrove* was liable for any bad debts made by him for goods sold from said store, whilst it was in his possession.

11. That the court required *Callender,* to procure and de-

liver to *Colegrove* sufficient indemnities for *Colegrove's* liabilities to sundry persons, on book, on notes and due-bills and on judgment, for goods purchased for said store.

*Toucey* and *Goodman*, for the plaintiff in error, after remarking, that the great object of the bill was to set aside the contract of the 10th of *November*, 1841, on the ground of fraud or mistake, contended,

1. That such contract ought not to be set aside, on the ground of fraud. In the first place, the answers of the defendants, which deny the fraud charged in the bill, would be *conclusive* upon the plaintiff, aside from the provisions of the 10th section of the statute regulating proceedings in equity. *Stat.* 220. (ed. 1838.)   *Pollard* v. *Lyman*, 1 *Day* 156. Though not conclusive now, they are still entitled to great consideration. Secondly, the committee have not found any fraud, but have expressly negatived the combination and fraud charged. Thirdly, fraud is a *fact*, which must be proved and found, as such ; and the court cannot infer it from other facts. *Weeden* v. *Hawes* & al., 10 *Conn. R.* 50. Fourthly, if the court could infer fraud, the facts detailed in the report of the committee, are not sufficient to warrant such an inference. The plaintiff was not entrapped or deceived ; on the contrary, he acted with his eyes open, and knew as much about the subject of the contract, as the defendant *Callender.*

2. That there was no such mistake as would require or authorize the court to set aside the contract. In the first place, the great object of the purchase was, the goods, the stand and the business. *Colegrove* was to *continue* that business. He took the *whole concern*, including the debts and credits; and took it understandingly, *as it was*. If in the end it turns out, that he made a less advantageous bargain than he expected, he cannot now repudiate it. He must abide the consequences of his voluntary act. He knew what he bought ; and what he bought he had. *Segur* v. *Tingley*, 11 *Conn. R.* 134. 142, 3.   *Thompson* v. *Jackson*, 3 *Rand.* 504. Secondly, the mistake was not sufficient in amount, compared with the whole transaction, to justify a rescission. *Golden* v. *Maupin*, 2 *J. J. Marsh.* 239.   *Collard's* heirs v. *Groom, Id.* 488.   *Reynolds* v. *Vance*, 4 *Bibb*, 215.   *Lee* v.

*Metcliffe*, 1 *A. K. Marsh.* 118. Thirdly, the mistake was one which admitted of compensation. *Davis* v. *James's* executors, 4 *J. J. Marsh.* 9. The plaintiff had adequate remedy, by deducting the amount from his liabilities under the contract. Fourthly, if the contract is rescinded, the parties cannot be placed in *statu quo*. *Turner* v. *Clay*, 3 *Bibb*, 53. *Collier* v. *Thompson*, 4 *Monroe*, 85.

3. That the plaintiff did not seek for a rescission of the contract, in a reasonable time. He was immediately put in possession of the books, and then had all the means of information regarding the errors in question, that he ever had; and it appears, that he in fact discovered and complained of some of them, soon after the sale.

4. That the difficulty of ascertaining the state of the concern from the books, furnished no ground for setting aside the contract. In the first place, there were other sources of information, and the plaintiff should have made further enquiry. 5 *Day*, 445. He had three weeks for this purpose. Secondly, he had equal means of knowledge with the plaintiff. *Harris* v. *Kemble*, 1 *Sim.* 111.

5. That the mortgages were an explicit affirmation of the contract, or a waiver of any right to set it aside. They were given with knowledge of the errors, or with full means of knowing them. The plaintiff was bound to make his election immediately; and he did make it, by going on with the business, selling the goods, blending them with his own, collecting the debts, &c. *Saddler* v. *Robinson's* heirs, 2 *Stew.* 520. *Lawrence* v. *Dale*, 3 *Johns. Ch. R.* 23. 42. *Mc. Neven* v. *Livingston*, 17 *Johns. R.* 437. *Verplanck* v. *Sterry* & ux. 12 *Johns. R.* 536.

6. That the mortgages of the 14th and 20th of *January* 1842, could not be set aside on the ground of mistake, because there was none when they were executed.

7. That the decree against the instrument of the 29th of *January*, cannot be sustained, on the bill and answer, and the finding of the committee. The bill alleges, that the plaintiff was induced to sign it, by menaces and artful representations; that it was never delivered, but left with Mr. *Goodman* upon an express understanding that it should not be delivered, without the consent of both parties; and that this was part of the original combination and design to defraud. The

defendant, *Callender* was called on to disclose in regard to these allegations. His disclosure shews, that the instrument in question, was fairly made and delivered; and the committee have not found the allegations true. *Chappedelaine* v. *Dechenaux*, 4 *Cranch*, 306. 309.

8. That the first report should have been set aside *entirely*. This should have been done, because, in the first place, it was untrue in a material part, which was the foundation of the decree. Secondly, the defendant was entitled to have all the facts in issue found one way or the other. Thirdly, the court cannot see that that part of the report which was rejected, had no bearing upon, or connexion with, the other facts in controversy. Fourthly, on a rehearing, the whole case ought to be open, that the committee may act understandingly upon every part.

9. That the decree in regard to the accommodation notes, is erroneous. There is no foundation for such a decree in the bill or report. In the first place, there is no allegation concerning them in the bill. They are not the subject either of complaint or of the relief sought. Secondly, they have no connexion with the purchase, or the mortgage, or the business carried on in the store.

10. That the decree in regard to the debts, which the plaintiff contracted in his own business, is erroneous. The court cannot decree that one man shall pay another's debts.

11. That the principle on which the whole account was taken, is erroneous, *viz.* that the plaintiff, in his mercantile business, was a trustee of *Callender*, and that *Callender* was answerable for its results.

*Hungerford* and *Fellowes*, contra, contended, 1. That the contract of the 10th of *November* 1841, upon the facts stated in the bill and found to be true, was fraudulent and void. *Colegrove* entered into that contract relying upon the representations made to him, by *Callender*, *Chapman*, and *Shepard*. From their representations he was made to understand, that the concern was in a sound state, and that the books were substantially correct; whereas the concern was then insolvent, and the books were so incorrect that no true information could be obtained from them. The committee have ascertained and pointed out six or seven errors, all of which,

with one exception of small amount, are *against* the concern; so that the concern was in fact, worse by 644 dollars, than it appeared from the books to be. To these are to be added the errors in the account of *R. & L. Callender.*

That *Callender knew* that the representations which he made in regard to the books and the state of the concern, were false, is evident from the finding of the committee. Before the sale, *Callender* said, that *Sears* had *looed* him out of what he put into the concern. At other times, *Callender* said, that *Sears* kept the books incorrectly; that he kept them so you could tell nothing by them; that he had lost money enough, and was going to get rid of the concern. [The counsel referred to other circumstances indicative of fraud, which cannot be detailed here.]

The facts being found, the law deduces the fraud. *Pettibone* v. *Stevens,* 15 *Conn. R.* 26. *Sturtevant* v. *Ballard,* 9 *Johns. R.* 337. 342. *Jackson* d. *Hooker* v. *Mather,* 7 *Cowen,* 301. 304.

2. That if the court can see no fraud here, it will still set aside the contract, on the ground of *material error.* The very thing which *Colegrove* supposed he was buying, had no existence. He used all proper diligence to obtain correct information, and was deceived.

3. That if the contract of the 10th of *November* was invalid, on the ground of either fraud or mistake, the subsequent contracts of the 14th and 20th of *January,* being based upon it, and part and parcel of the same transaction, must fall with it; and the plaintiff is entitled to an account of every thing pertaining to his goods or estate received by *Callender* under these contracts, unless debarred, by the instrument of the 29th of *January.*

4. That the last-mentioned instrument is no bar to the plaintiff's claims. In the first place, it is one in the series of fraudulent transactions, and manifestly designed to consummate the fraud. But, secondly, this instrument is no bar, because it was never *delivered. Callender* sets it up in bar. The *onus* is on him to prove a delivery. This he has failed to do. On the contrary, the circumstances in which it was left with the depositary, shew, that there was no delivery.

5. That the court properly refused to reject the report *in toto.* There could be no ground for recommitting those

parts which were correct. A court of chancery in this state finds, and is by statute bound to find, the facts on which its decree is founded. This it does, by a hearing in court, or by the report of a committee, or partly by one method and partly by the other; but in the end, the *court* finds the facts; which was done in this case. The office of a committee is more like that of a master in chancery, than of a jury in a court of law.

6. That the testimony of the plaintiff and his account books, were admissible. In the first place, it was necessary to the relief sought, that an account should be taken. Secondly, wherever an account is taken, whether at law or in chancery, the testimoney of the parties and their books, are admissible.

7. That the decree regarding the outstanding accommodation notes, and the notes and accounts against *Colegrove* for goods purchased for the *Front* street store, which went to *Callender's* benefit, was correct. As *Callender* had the benefit of these accommodation notes, and of the goods so purchased, it is clearly equitable that he should protect *Colegrove* from the liabilities which he had thereby incurred.

WILLIAMS, Ch. J. It is claimed, 1. That the facts found do not warrant any decree against the defendant, *R. Callender.* The combination is not found; but it is found, that in *April,* 1840, *John R. Sears* commenced the business of a grocer and trader, in a store at the corner of *Front* and *Ferry* streets in *Hartford;* that *Ralph Callender* put in 1,500 dollars capital, expecting a like amount from *Sears,* who put in nothing; that *Richard Shepard* was a clerk there; that in *April,* 1841, an inventory was taken, by which it appeared, there was a loss of 250 or 300 dollars; that in *June,* 1841, *Callender* purchased all *Sears'* right therein, and put *Reuben A. Chapman* in possession, who carried on the business in his own name, but for the use of *Callender;* that in *September,* 1841, *Chapman* took an inventory, which he meant should be accurate, showing the amount of goods at cost to be 3,431 dollars, 47 cents, the credits 3465 dollars, 79 cents, and a gain of 600 or 800 dollars; though the committee were not satisfied there was any such gain. In *July,* 1841, these parties met in relation to a purchase and sale of these goods. Terms were given, and *Colegrove* said he did not know any thing

HARVARD LAW LIBRARY

about the concern, but he would look into it, and see how it stood; and soon after, he went with *Callender*, and spent some time in examining the books and goods, and enquired of *Callender*, of *Chapman* and *Shepard*, as to the state of the accounts. *Callender* gave him to understand they were pretty nearly correct; so far as he knew about them, they were so. *Chapman* said, some of them were good, some were bad. *Shepard* said, he did not keep the books; but gave him to understand, they were nearly correct. *Colegrove* was disposed to purchase the goods, without the debts. *Callender* said, he should sell the concern as it was, if he sold, and *Colegrove* might satisfy himself. In about a week, *Colegrove* made up his mind to take the concern. *Colegrove's* object seems to have been, to purchase the goods, and perhaps the good will of the store. These were open to observation. *Callender* would not part with them, unless he took the debts due to the store, and paid the debts due from it. These, it is presumed, *Colegrove* could know nothing about, but from the information of *Callender* and his agents, and from the books themselves. What the precise information given, as to the state of the concern, by *Callender* and his agents, was, we are not told; but are only told, that they represented the books as nearly correct, and that *Colegrove* was induced to enter into the agreement which he made, principally by the favourable representations made by these persons, and trusting to the information he derived from an examination of said books and accounts; and relying upon them as substantially correct, and without knowing that they were otherwise, he, on the 10th of *November*, 1841, bought of *Callender* all his right in the store at the corner of *Front* and *Ferry* streets, and the goods in the store of *A. Denslow*, the book accounts, notes, receipts for goods and cash belonging to *Callender* in said business, the lease of said store and yard, the policy of insurance, and the fixtures; and he was to pay all notes and accounts against *R. A. Chapman* and *J. R. Sears*, belonging to the business of said store, and gave his notes for 2,920 dollars, 45 cents.

*Colegrove* could not make this agreement understandingly, without the books showed, with something like accuracy, the state of the concern. What, then, was the state of the books? The committee have reported inaccuracies in six accounts,

amounting to more than six hundred dollars in favour of the concern. But they refer more particularly to the account of *R. & L. Callender,* which, on the day of sale, showed a balance due the concern, (when an error of the committee is corrected,) of 4,073 dollars, 11 cents, when in fact there were but 1,667 dollars, 76 cents due, showing, in this one item, a mistake of 2,405 dollars, 35 cents.

It is said, that *Colegrove* knew of the advancement by *Callender,* of 1,500 dollars. The committee do find, that he was to pay the capital *Callender* put in; but they do not find he knew what that was, before he made the agreement. If he did know that fact, his knowledge from other sources does not in any measure tend to confirm the accuracy of the books. There is, then, in these several items, to be deducted from the credit to this concern, more than 3,000 dollars. If, however, the capital was known, the concern was *minus* 1,500 dollars from what the books would show; and either of these sums deducted from 5,465 dollars, the apparent credit would have had a most important influence upon this bargain.

But it is said, the committee have not found that the whole sum that appears on the books, was not due from *Callender.* It is true, that it is not found in terms; but the committee find the sum appearing on the 10th of *November*, the day of the agreement. They then find the sum due on the 14th of *January*, 1842, reduced to 2,438 dollars, 90 cents; and on the 27th of *January*, to 1,447 dollars, 76 cents. It is not shown, that any payments had been made to reduce this account, by *Callender* to *Colegrove*; and it is not to be supposed, that when *Colegrove* owed *Callender* for this stock, and *Callender* was so anxious as to be requiring mortgages and issuing attachments to secure his debt, he would be making advances to *Colegrove;* and yet the committee find, that on the 14th day of *January*, a little more than two months after the sale, when the parties were getting the items together with a view to a settlement, credits of cash and interest to the amount of 3,444 dollars, 79 cents, and of bills not credited to the amount of 765 dollars, 96 cents, were entered by *Colegrove* from loose scraps of paper, and other items in another hand, including the capital, to the amount of 1,935 dollars, 54 cents. We cannot believe but that, if these credits had arisen since

the sale, this would have been at least claimed on the trial below.

*Hartford,*
June, 1845.

Callender
*v.*
Colegrove.

These credits to *Callender*, had there not been other errors, would have made the balance in *Callender's* favour, had it not been there were charges against him not appearing on the books at all—one of 1,077 dollars, 14 cents, and other charges to the amount of 1,674 dollars, 66 cents. These last, though they do not affect *Colegrove*, in the same manner as the others, equally show, that no reliance could be placed upon the books. Aside from the specific errors pointed out by the committee, they say, that the books were kept in such a state, that it was difficult for any person not previously acquainted with them, or with the transactions to which they referred, to obtain from them any certain information as to the true condition of said concern, on the whole; nor could the committee, with all the evidence the parties could produce, determine, with any definiteness, what was the state of the concern, at the time of the sale. *Callender's* accounts too, they say, were kept in an unusual manner, " as if to add to the difficulties."

It is said, however, by the plaintiff in error, that the committee have not found fraud or *mala fides;* and this court cannot find it. But the committee reported to the superior court certain facts, and left that court to draw inferences as to other facts therefrom; and that court have adjudged thereon, that this contract was fraudulent and void: and we doubt very much, whether this court can, on a writ of error, review that evidence. But if they could, we are not prepared to say they came to a wrong conclusion. *Callender* and his agents made a most favourable representation of the state of that concern. Had he reason to believe it was so ?

It appears, that during the first year, the concern had lost money—200 to 300 dollars—and this appeared from the inventory taken in *April*. *Sears* had never brought in any capital. Must not *Callender* have known these facts; and was he not determined to rid himself of a losing business ? To one witness he said, *Sears* had looed him out of what he had put into the concern. He declares he had a good many loafers about him, and he meant to shake them off; that he was going to get rid of the store; that he had lost money enough. In *June*, another inventory was made, with a simi

HARVARD LAW LIBRARY

lar result. The only evidence tending to show that the concern was more prosperous, was that arising from the inventory made by *Chapman,* shewing a gain of 600 or 800 dollars; which, however, was a mistaken one; and even then, it seems from the report, that *Chapman* barely " supposed, from the inventory taken, that the store would pay its debts." When we hear *Callender* asserting, that the books were pretty correct—they were, so far as he knew—and read the account given by the committee of the state of those books, and particularly as to the state of the accounts against *Callender's* own house, it is too much to presume *Callender* was ignorant of their real character. He knew, or ought to have known, that they gave a very imperfect and erroneous view of the situation of the business, and were calculated to deceive; and when he was afterwards told of the errors in the books, he expressed no surprise, but promised to make all right. We are not, therefore, prepared to depart from the conclusion of the superior court, that the contract on the 10th of *November* was fraudulent.

It is said, that the court cannot find facts, and the committee have not found fraud. But the committee have found the facts, and submitted them to the superior court, who have adjudged, as they might, that they were sufficient evidence of fraud. But if there was no fraud, *Colegrove* entered into the contract under a mistake as to the real state of that concern. The books did not show the real state of the business; he could not learn from them much about it; and no one is able now to tell the condition of the concern. Enough is known to see, that it was very different from the representation given by the books, and that no dependence could be placed upon them.

When, then, it is found, that *Colegrove* entered into that agreement principally by the favourable representation of the concern made by *Callender, Chapman* and *Shepard,* and relying upon the books and accounts as substantially correct, we think the case comes within the principles admitted by the counsel of *Callender.* The substantial object of the contract was defeated, and it is impossible to do justice to the party; for such is the state of the books, that he can never prove or know what he has suffered.

2. It is said, that *Colegrove* did not seek to rescind the

*Hartford,*
June, 1845.

Callender
*v.*
Colegrove.

contract within a reasonable time; and so the court should not have interfered. Now, what is a reasonable time cannot appear, unless we are informed when he made the discoveries of the errors. That he discovered there were errors early, it is true; and he mentioned it to *Callender*, who promised to rectify them. How long he delayed, for these promises, we do not know; but from the nature of the errors, they must have come gradually, and probably singly, to his knowledge. The greatest one—that in regard to *Callender's* account— does not appear to have been known to *Colegrove*, until the attempted settlement on the 14th of *January*, 1842, in which all the goods in the *Front* street store, and all the notes and accounts bought of *Callender*, were placed back into his hands; so that *Callender* could lose nothing by the delay which intervened between that time and the time of bringing the bill.

3. Again, it is said, that *Colegrove* waived his rights, by the subsequent mortgage he made, and thus ratified the bargain. The question of waiver is a question of fact; and it does not appear upon this record, that any such question was made below, or that all the facts are stated in relation to it. That *Colegrove* was dissatisfied; that he complained; and that the defendant *Callender* promised to make all right, is certain; and, as was observed in answer to the preceding objection, when he found how incorrect the accounts were, does not appear; and indeed from the nature of the case, the information must have been gradually acquired. The first mortgage was on the 14th of *January*; and the committee find, that it was soon *after* that, when preparing for a settlement, that the facts in relation to the accounts of *R. & L. Callender* appear. Until then, there is no reason to believe, that *Colegrove* could have elected to rescind the agreement. In the argument, it was claimed by the counsel for the plaintiff in error, that the bill showed, that *Colegrove* had full knowledge of the facts. We need only say, that we find nothing in the bill to authorize this assertion. As to the mortgage of the goods in the *Market* street store, on the 20th of *January*, made under the terrors of an attachment, and by the advice of the sheriff, of whom *Colegrove* so earnestly enquired what he should do, and under the promise of *Callender* that he would make all right, we are not satisfied that there was any thing like a

waiver of any legal right, or any thing which should subject *Colegrove* to any additional inconvenience, by the delay. Were this court, then, to review the question of waiver, we should not differ from the superior court in the result.

4. Another ground of complaint is, that the subsequent contracts were set aside, by the decree of the superior court. These contracts were entered into merely to secure the performance by *Colegrove* of the agreement of the 10th of *November ;* and it would seem to follow, as a matter of course, that if that contract was set aside, all those contracts which were merely auxiliary to it, must fall with it. If a debt is paid, a mortgage to secure that debt can be of no value to the pretended creditor ; it would only remain as a cloud over the estate ; and if the debt cease to exist in any other way, no reason exists why the security should remain. However it might be in a court of law, a court of equity will say, that the security shall attend the debt—shall follow it, or terminate with it.

5. But there is another instrument, dated the 29th of *January,* 1842, signed by the parties, in the hands of Mr. *Goodman,* purporting to be an assignment of all right of *Colegrove* in these goods and debts, and a general release, with a release from *Callender* to *Colegrove* of any debt owed to him by *Colegrove.* This, also, is set aside, by the decree. This agreement, the bill alleges, never was delivered, but placed in the hands of Mr. *Goodman,* to await the order of the parties. On this subject, the committee do not find there was a delivery of this instrument, but detail the facts in relation to its coming into the hands of Mr. *Goodman,* and what was done under it. It is very certain, that these facts do not prove a delivery ; and it is claimed, therefore, on the part of *Colegrove,* that it ought not to remain outstanding.

The counsel for *Callender* say, that he has sworn it was delivered, and if it was not, it is for the plaintiff to prove it. They have claimed, here and in other parts of the case, that the answers of these defendants are to be considered by this court, as evidence in the cause. The court do not agree to this view of the matter. The answers are before us, because they are part of the record ; but they form no part of the evidence before the court. That evidence, so far as appears to this court, is derived from the reports of the committee ; and whether the committee find the facts in the answer true or

not, can only be known by the report itself, or by the finding of the court.

Hartford,
June, 1845.

Callender
v.
Colegrove.

There is, then, no evidence of the delivery of this writing, but what appears upon the report of the committee; from which it does not appear to have been delivered to *Callender*, but it was left with Mr. *Goodman*—with what intent does not distinctly appear. If the defendant, *Callender*, claimed any thing under this agreement, it would seem necessary for him to show a delivery. But he says, he has claimed nothing by it—not even a waiver. Now, if he claims nothing under it, why should he object to its being set aside; and if he does claim any thing from it, why should he not show that it was a subsisting instrument that was delivered? We have no satisfactory answer to these enquiries. The answer given, is, that the bill is brought to set aside this instrument; and the allegations on which the claim is founded, are not found to be true.

Aside from the general charge of fraud, the principal allegation of the plaintiff's bill in relation to this instrument, is, that it was not delivered; that he consented it should be placed in *Goodman's* hands, but never that it should go into the possession of *Callender*. The counsel of *Callender* claim that he, in his answer, denies a new delivery—in other words, he sets up that the instrument was delivered; and this he certainly must do, if he claims any thing by it, though his counsel have not chosen to use it in this manner. *Callender*, in his answer, does not directly affirm, that there ever was a delivery to him; but he says, it was to be left in the hands of Mr. *Goodman*, that each party might have access to it; and that this was done to save the expense of a duplicate; and that when he executed it, he believed it was to be a full and final end of the concern; and he believed *Colegrove* so considered it. By this answer, then, *Callender* means to claim, that the instrument was in fact delivered; and he must claim it, or it is of no importance to him whether it be set aside or not. The parties, then, are at issue on this point; and bring their proof before the committee. The committee find the facts attending it, which do not prove a delivery. We think, then, it follows, that the plaintiff has proved, substantially, the allegation in his bill, that it was never delivered; at all events,

Callender
*v.*
Colegrove.

that the court were correct in saying, that it *should not remain* as a subsisting, outstanding contract.

6. Sundry exceptions are assigned as matters of error, in the 8th, 9th, and 10th assignments, to the manner of taking this account between the parties. In answer to all of which, it is to be observed, that the account itself is not given by the committee; and the manner in which it was taken, does not appear upon this record. All the exceptions which were taken to the second report, were found untrue, except so far as consistent with the facts stated by the committee; and this court are not called upon to say, that in taking this account the court erred, when we cannot know the principles upon which it was taken, without taking it from the assignment of errors, or enquiring into the facts in relation to it; neither of which can be seriously claimed.

With respect to these exceptions, it is enough to say, the record lays no foundation for them. It does, however, appear, that by the decree *Callender* was made liable for sundry goods purchased by *Colegrove* for the *Front* street store. Now, as *Colegrove* had purchased the goods for the store, and *Callender* had taken them into his possession, he certainly ought to pay for them. But as *Colegrove* himself had not paid for them, the court, instead of adding to the judgment against *Callender* the amount of these goods, decree that *Callender* shall indemnify him against these claims; thus doing entire justice to all parties. *Callender* has to pay for the goods but once; he then has no reason to complain; and as *Colegrove* has not actually paid for them, he cannot complain; and the decree is calculated to do entire justice, in respect to all the parties.

7. Another question was made as to the notes of hand given by *Colegrove* to *Callender.* Now, it does not appear very clearly, what these notes were given for. If they constitute a separate, distinct transaction, it is very certain the decree is not correct; but if they are part and parcel of these transactions, it is as it should be. The notes are dated on the 5th of *November;* but it is found, that they were in *fact made after* that time—that is, while *Colegrove* was in the occupation of the *Front* street store. They were made at the request of *Callender,* without any valuable consideration. The facts which the committee report, as respects this part

*Hartford,*
June, 1845.

Callender
*v.*
Colegrove.

of the case, are shortly these. After examining the accounts, they find a balance due to *Colegrove* of 1322 dollars, 26 cents. Besides that, they find, that *Colegrove* has purchased a variety of goods for said store, which were mixed with the other goods in said store, which *Callender* has now got into his hands, which they have not charged to him in this account, because *Colegrove* has not actually paid for them ; and they find, that *Colegrove* has given several notes to *Callender*, or orders, which are outstanding, and which, therefore, they have not charged, as *Callender* may yet be obliged to take them up. Now, to make an end of this controversy, the court say, *Callender* shall indemnify *Colegrove* against these debts and these notes ; and we see no reason why he should not. *Colegrove*, being supposed to be in debt to *Callender*, gives him accommodation notes. Had he paid them, surely those payments might have been charged and allowed in this account. As he has not paid them, they must either lie outstanding until he has paid them, and then bring another suit against *Callender* ; or they must be considered in this suit. We think better justice is done, by the latter course. It is said, there is nothing in the bill about them, and no claim that they were obtained by fraud. It is true, they are not specified in the bill; and it is not now claimed by the plaintiff, that they were an independent transaction. The fact that they were exhibited before this committee, and that no objection was made upon that ground, gives us strong reason to believe they were part of the transaction. Besides this, it is to be remembered, that this fact comes out in the second report, which is conversant only about the accounts of the parties, showing that these notes were part of the claim in the account, and not a distinct and separate transaction.

8. Again, it is objected, that the plaintiff was admitted as a witness. And why should he not be ? It appears, that this was upon the second hearing before the committee, when the only question before them, was in relation to the accounts of the parties ; and the objection was to the testimony of the plaintiff and his account book in relation to the accounts between the parties. No authority is shown in support of this objection ; and we know of no reason or practice to support it.

*Hartford,*
*June, 1845.*

*Callender*
*v.*
*Colegrove.*

Another error was assigned, which perhaps ought to be noticed, that the court did not entirely reject the first report, but rejected only that part to which exception was allowed. The object of trial by a committee, is, to ascertain facts. Now, if it is shown to the court, that on some particular points they have committed a mistake, and therefore, that injustice would be done, it is highly proper that that mistake should be corrected ; but we see no reason why all the rest they have done should be undone, and the parties set again entirely afloat, as before.    Here, after a laborious investigation, the committee had ascertained the great facts on which these parties were at issue ; but in the course of proceedings, some mistake had intervened in the matter of account.    By opening the whole case, the cause of litigation might be advanced ; but certainly the cause of justice could not be; and we had supposed, that the principle which would regulate the court, was sufficiently announced in the case of *Smith* **v.** *Brush*, 11 *Conn. R.* 359.

We think there is no error in the judgment complained of.

In this opinion the other Judges concurred.

Judgment affirmed.