1843.

Powell
v.
Murray.

-----

## POWELL and others *vs.* MURRAY and others.

Where an agreement has been acquiesced in for 38 years, and during that period one of the parties has died, on a bill filed by the surviving party to set it aside, the representatives of the deceased party will not be required to prove a sufficient consideration for the agreement ; but the complainant will be required not only to show that the agreement was without consideration, but also that it was improperly obtained.

Where a testator in his will charges a legacy on a particular estate, and declares that it is to be raised out of such estate and not otherwise, the general estate of the testator is not liable for the payment of the legacy in the event of the particular estate being insufficient for that purpose.

Where an executor neglects his duty, by omitting to invest the amount of a legacy paid into his hands, and where he refuses to bring the fund into court, when requested to do so by the legatees, for the purpose of having it secured for them ; upon a bill filed against him by the legatees, to compel him to comply with their request, he will be charged with the costs of the suit.

But where in the bill the complainants make a further claim against the defendant, which they fail to establish, the parties will be left to bear their respective costs of the prosecution and defence of the suit.

April 4.

THIS was an appeal by the complainants from a decree of the vice chancellor of the first circuit. The material facts are stated, in substance, in the report of the case before the vice chancellor, in 2 *Edw. Ch. R.* 636.

*G. Sullivan,* for the appellants.

*J. L. Mason,* for the representatives of John B. Murray.

*S. A. Foot,* for O. Kane, executor of J. I. Clark.

THE CHANCELLOR. The principal object of the bill appears to have been to set aside an agreement made in 1792, between Anne Powell, the complainant, and Murray & Clark who were the residuary devisees of the real estate, in Boston, upon which the legacy of £2000 sterling to Mrs. Powell and her issue was charged. What were the real circumstances of that transaction it is impossible to ascertain with any degree of certainty. But as the complainants thought proper to wait thirty-eight years after the agreement was entered into, and until Murray & Clark were both dead, before the bill in this cause was filed, their representatives ought not to be held to prove a sufficient consideration for that agreement. On the contrary, the complainants ought to be compelled to show, beyond all question, that the agreement was not only destitute of consideration, but was improperly obtained.

I see by the testimony and documentary proof, that previous to this agreement a difficulty had arisen in respect to the repairs of the premises upon which this legacy was charged. And from which it may be fairly inferred, that the income of the premises was not sufficient to pay the interest on the £2000, charged upon such premises, in addition to the ordinary repairs which were required from time to time. And if so, there is good reason to suppose that the property would not have been sold at that time for a sufficient sum to pay the entire legacy. For we know, as a matter of history, that for several years after the close of the revolution the value of property of every kind was very much depressed. Indeed, such was the scarcity of money in Massachusetts, that a year or two after the death of the testatrix a rebellion broke out, and armed forces assembled at Springfield, Worcester, and other places, to prevent the holding of courts for the recovery of debts ; and the state was obliged to raise a temporary army of more than four

thousand men to check the progress of the insurrection. It is true, order was restored as early as 1788, and from the time of the meeting of the first congress in 1789, confidence was gradually restored, and the value of property continued to improve.    There is no doubt, however, that money continued very scarce, and the value of property much depressed, as late as 1792, when this agreement was made.

I see by the testimony of G. W. Murray, that previous to this settlement a question had arisen whether the general estate of the testatrix was liable to make good the amount of this legacy, if the particular property upon which it was charged should prove insufficient.    And the witness states that Chief Justice Powell contended that the general estate was liable for the payment of the legacy, whether the particular estate upon which it was charged produced more or less ; and that he should look to the estate for both principal and interest, if the estimated value of the sugar house, &c. did not produce enough.    He was unquestionably wrong in that respect.    For by the terms of the will the legacy is charged upon the particular estate thereafter described.    And the testatrix concludes the description of the property by saying that the legacy of £2000 is to be raised from the property thus charged, and not otherwise.    I allude to this fact for the purpose of showing that it was questionable, at the time this agreement was made, whether the property, if then sold, would produce enough to raise the whole amount of the legacy ; so as to entitle Mrs. Powell to the interest on that amount, for life, without depriving her children of a part of the principal of the legacy after her death.    This testimony also shows that Mrs. Powell and her husband could not have been ignorant of the provision, in the will of her aunt, which authorized the executors to sell the property for the purpose of raising the legacy.

If the income of the property was not sufficient to keep it in repair and insured against fire, and to pay the whole interest on the legacy, it certainly was a fair subject of compromise.    Although it appears that the property was sold

two years afterwards, for enough to have paid the whole £2000 legacy, it does not follow that either party to this arrangement believed it could have been sold for the same amount in March, 1792, at the time when this compromise was made. It is impossible, therefore, for any one to say, at this time, that Mrs. Powell did not make a good bargain for herself and children, considering the then situation of the property, and the repairs which would be necessary to prevent it from running down. For she secured a certain annuity of $400 to herself for life, and the making of the necessary repairs upon the premises, so that her children should have the whole £2000 sterling after her death.

And the fact that her husband did not join in the agreement at the time it was executed is immaterial. For it is perfectly evident that if he was not actually consulted beforehand, he confirmed it afterwards, by acting under it for more than a third of a century. And although he once talked of a chancery suit, he let the matter rest for more than twenty years afterwards. If the agreement was properly and honestly made, in 1792, the fact that the residuary devisees were able to sell the property, two or three years afterwards, for more than the amount of the legacy, cannot alter the case. For there is no connection whatever between that agreement, and the subsequent sale, and the investment of the proceeds to secure the payment of the annuity to Mrs. Powell for life, and the whole capital of the legacy after her death. I think the vice chancellor was clearly right in refusing to disturb the agreement which was entered into in March, 1792.

As Clark and Murray were two of the executors, and had the right, with the concurrence of their co-executor, to sell the property for the purpose of raising the money for the legacy, if this was a case of recent occurrence it might be proper to require them to show that they did not take any improper advantage of their situation, to obtain from Mrs. Powell a hard and unconscientious agreement. But after she, and her husband, who was a lawyer of eminence and perfectly competent to protect her rights, have

suffered this matter to rest until the only parties who could explain the transaction were in their graves, it certainly would not be right to cast such a burden upon the representatives of those parties at this time.

The executors of Clark had closed this trust, under the laws of the state where their testator was domiciled, and where probate of his will was obtained, many years before this suit was commenced. And as their testator did not receive the fund appropriated for the payment of this legacy, and the complainants had failed in respect to the main object of the bill, they were properly charged with the costs of the executor who appeared and answered.

Murray has not done his duty, in leaving the legacy uninvested, after it was paid over to him upon the sale of the property of Robins to the Exchange Company. And if the only claim made by the bill had been to have the fund brought into court and secured, by his representatives, it would have been a proper case to charge his estate with the costs of the suit. The security of the fund, for his wife and children, was all that Chief Justice Powell asked in their behalf in his letter of February, 1828; and that request was perfectly reasonable and proper, and should have been immediately complied with. But in connection with that proper claim on the part of the complainants, they have chosen to make this attempt to set aside the original agreement, which had so long been acquiesced in. And having failed as to that, I think the vice chancellor very properly left both them and the representatives of Murray to bear their own costs of the prosecution and defence of the suit.

For these reasons I think the decree appealed from was not erroneous as to the complainants. And it must be affirmed with costs.