By the Court,
Jones, J.
There are two distinct branches to this case. The one relating to the subscription earned prior to the assignment to Scott; the other relating to the claim for subscriptions subsequent to that period. As to the subscription earned prior to the assignment to Scott, that was a demand then due and owing. If this debt had been owing to an entire stranger, there is no question but that Mrs. Henderson, under the acts of 1848, 1849, 1860 and 1862, would, by an assignment thereof to her, by such stranger, have taken it as her sole and separate property, and would have had complete authority to assign it, not only without the consent, but without the knowledge of her husband.
If, then, the debt, by reason of the assignment to Scott, and the assignment by Scott to the plaintiff and Mrs. Henderson, is to be regarded as not coming from the husband to her, she had full authority to assign it, without the consent or knowledge of her husband. '
If, however, under all the circumstances, the debt is to be regarded as coming to her from her husband, then the acts of 1848, 1849, 1860 and 1862, have no application to the case, and her title to it as' her separate property, and her right to dispose of it, must depend on the principles of jurisprudence existing before the passage of these acts.
In equity the rule obtained that a husband might make a gift to his wife inter vivos, and that such gift might be made with or without the intervention of trustees ; that such gift need not be evidenced, or made, by any formal deed of trust or of gift, nor by any formal writing, but might be made and evidenced by acts and declarations ; that if necessary the court *134 will regard the husband as trustee for the wife. (Neufville v. Thomson, 3 Edw. 92.)
In this case, I think the various assignments are amply sufficient to constitute a gift to the wife, as between husband and wife, of the matters assigned, as and for her sole and separate property.
It is true that there is nothing on the face of either of the assignments, indicating'that the intention of the giver was to vest the property in the wife as her sole and separate estate, and to exclude the husband from any participation therein. There is a line of decisions holding such an indication to be, ordinarily, necessary. That line of decisions, however, has no application where the husband is himself the giver, during coverture. The bare fact of his making the gift, is as strong evidence of his intent that it should be the sole and separate property of his wife, as any declaration in writing would be.
Thus, then, according to the equity law as it stood prior to 1848, and as it still stands, the assignments in this' case would vest the assigned property in the wife, as her sole and separate property.
The property then being her sole and separate property, she had the full power of disposition over it, without the assent or concurrence of her husband. (Powell v. Murray, 2 Edw. 635, cited from 642.) Even if this were not so, yet here the husband stood by and saw his wife sign and deliver •the assignment, without objection. This is sufficient evidence of his assent and concurrence. (Powell v. Murray, 10 Paige, 256.)
It may be suggested that inasmuch as the words of the acts of 1848 and >1849 are, “ It shall be lawful for any married female t.o receive * * * * from any person other than her husband,” those acts abrogate the equity rule above referred to. I think this is not the proper construction. The title of the act of 1848, (of which act that of 1849, is an amendation,) is “ An act for the more effectual protection of the property of married women.” The spirit of all the acts, as indicated by their titles and provisions, is to enlarge and *135 not curtail the rights and privileges of married women in acquiring, holding, and disposing of property. . A construction then should not be given, which would take away rights and privileges enjoyed by married women, before the passage of those acts, since such construction would be in direct conflict with the general tenor and spirit of the legislation. If, however, such construction is impelled by direct, unambiguous words and expressions, the court must so construe the acts. But I think that the language of those acts does not imperatively call for such a construction. There are no negative words, making it unlawful for a wife to receive property from her husband in the manner, theretofore, recognized by equity. If, then, those acts take away such previously existing right of the wife, it must be by implication from the use of the words “other than her husband.” Now, although perhaps these words may be so construed as to prohibit the wife from receiving property from the husband, yet they are also capable of being construed as being inserted for the mere purpose of limiting the provisions of the act to property other than that received from the husband, leaving the transfer or gift of property, from the husband to the wife, to be effected, and the wife’s rights and powers over and in relation to such property to be regulated, according to the law as it stood, prior to the passage of the act.
This latter construction should be adopted under the rule that the spirit of the law may be referred to' in order to interpret words admitting of two meanings; (Beebee v. Griffing, 14 N. Y. Rep. 235;) and that the intention of the law giver is to be adduced from a view of the whole and every part of a statute to be taken and compared together, and the real intention when actually ascertained, will always prevail over the literal. (People v. Draper, 15 N. Y. Rep. 532.)
It is immaterial, then, whether this debt due from the defendant, came to the wife from her husband, or from a stranger. In either event the plaintiff obtained a good title through the wife’s assignment.
*136 The plaintiff should not have been non suited as to the amount claimed to be due November 30, 1861.
This brings me to the second branch of the case, which .is as to the amount claimed to have become due subsequent to the assignments to and by Scott, and while. the business was carried on by the plaintiff and Phebe A. Henderson, Under the acts of 1848, 1849, 1860, and11862, it is perfectly clear that a married woman can carry on business on her own account, and that a stranger can set her up in business. It is, however, urged that a husband cannot set his wife up in business. I am unable to see why not. He can, as is seen above, give either money or goods to his wife, to be held by her as her separate property. After he has made the gift, it is no business of his, what she does with the goods. As the law allows her to carry on.business on her own account, she has as much power and right to use the goods or money given her by her husband in carrying on her business, as she has to keep them in her possession, and make personal use of them.
The tact that she employs her husband as an agent, does not affect rights which she would have if she had employed a stranger.
It must be understood that the remarks thus far are intended to apply only to cases arising between a married woman, or her assignees, and a debtor who is claimed to owe a debt which is alleged to be the separate property of the' married woman. It is not intended to apply them to cases where the rights of creditors of the husband or the wife, or of the business, intervene. In such cases all, or only part, or none- of the above principles may apply according to the facts and circumstances of each case.
There is an objection to the plaintiff’s right of recovery on this branch of. the case, remaining to be considered. This objection is that the original contract calling for the personal services of James Henderson, his assignees cannot perform the contract apd recover the stipulated compensation therefor.
. It is clear that if a man contracts to render personal services to another, he cannot by assigning his contract, or in any other *137 way, force his employer to accept the services of some other person-. If he assigns his contract, it is a breach of it, and the employer may elect to consider it at an end, and recover damage for its breach. But it is equally clear that the employer may consent to have an assignee substituted in the place of the original employee, and that such substitute, upon performing the contract, will be entitled to recover the stipulated price therefor. Nor is it necessary that there should be an express consent; it may he implied from the employer with knowledge of the assignment standing by and seeing the work performed by the assignee.
The question that arises in this case, however, is whether an assignee of such a contract can go an and perform, "and recover the pay for the performance of the contract, in cases where the employer was ignorant of the assignment and of the fact that the work was being performed by the assignee ? I think he can, in those cases where all the conditions precedent to the pay, (except the one of the work being done by the original employee,) have been performed in a manner just as good and as satisfactory to the employer as if done by the original employee, and the employer has received all the expected benefit of the work. I see no reason why the employer should in such a case escape payment.
In the case at bar the contract was to pay $30 a year for the use of a certain book, and for receiving such information as the defendant asked for. The assignment did not interfere with the use cf the book, nor make such use less valuable, or less satisfactory. Since the making the assignment, the defendant has not asked for any information, other than that contained in the book. He did not know of the assignment; so that the fact of its having been made, did not cause him to cease making inquiries. On this motion we can only ascribe as a reason for his leaving, that he had no occasion to make inquiries.
It seems to me that the new firm has fully performed the contract of the old firm, and that the defendant has not been *138 one whit injured hy the substitution of Phebe A. for James Henderson.
The defendant, by his contract, was to pay $30 a year for the use of the book, and for such additional information as he might require ; if he required no additional information, then of course he paid his $30 for the mere use of the book. Thus under the plaintiff’s evidence, as he did not require any Additional information after ¡November, 1860, he would have been obliged to pay the original firm of James Henderson & Co., (conceding no change to .have taken place in the members of the firm,) his annual subscription for the mere use of the book. According to the plaintiff’s evidence, he has used this same book during the term sued for, and I see no reason why the hare fact of there having been a change in the members of the firm should exonerate him from payment for such use.-
For these reasons, I think there was error in dismissing the complaint.
• The exception to the granting of the nonsuit must be sustained, the nonsuit must he set' aside, and a new trial ordered, with costs to abide the event.