M’Girk, C. J.,
delivered the opinion of the Court.
In the year 1827, Craig brought a bill in Chancery against James E. Perry and wife in the Circuit Court of Washington county. The substance of the bill is, that in the year 1810, some time in the spring of the year,he had occasion to borrow the-sum of five Hundred dollars, and that he applied tó James Bryan, who then lived in-the now limits of the county of Washington, to lend him the same; that Craig then lived in Ste.’ Genevieve county, at the Mississippi salt works; ’ that Bryan agreed to lénd him the money, and did do so on the 10th of July of the same year, and that Craig in consideration of said loan, and to secure the re-payment to Bryan, executed to him a deed of mortgage on the same day for a certain negro woman named Sarah, and her child, which negroes with their increase were to be returned to Craig by *361 Bryan, so soon thereafter as Craig should repay the money with interest, and that the slaves had long been and then were in possession of Craig, and that he then delivered the same to Bryan for the purpose of securing the payment of the money, and that he then executed to Bryan the following mortgage under his seal: “ Know all men by these presents, that I, George Craig, for and in consideration of the sum of five hundred dollars lawful money, to me in hand paid by James Bryan, have bargained, sold and delivered, and by these presents doth bargain, sell and deliver unto the said Bryan, one negro woman slave, and child one year old, the woman about 2.7 years, named Sarah, and I hereby warrant and defend the title and claim to the said negro woman, and that she is healthy and sound, upon these conditions, that the said negro woman may be redeemed by the said Craig according to the tenor and effect of his contract entered into with said Bryan. Given under my hand and seal this 10th day of July, 1810, (signed) George Craig. [Seal.”] The bill then states that Craig in the spring of the year 1810, when he borrowed the money of Bryan, was engaged in the county of Ste. Genevieve, in which Bryan then lived, in making and manufacturing salt, and that Bryan was then engaged in merchandizing in said county, at a place now in Washington county, and that Bryan expressly agreed with Craig to take salt to the amount of said loan at the rate of two dollars per bushel, from time to time, as Craig could make it, saying he could or would rather have the salt than the money, as he could sell it at a profit. The bill then states this is the agreement alluded to in the condition of the deed of sale and mortgage; Craig says about that time he actually, in pursuance of the agreement, did sell and deliver to Bryan one hundred bushels of salt, at two dollars per bushel, and also, after the date of the deed of mortgage, he delivered one hundred bushéls more, at the request of Bryan, on the agreement. Craig mended his bill, and made the executors of Samuel Perry and Timothy M. Bryan parties. By this amended bill, he states the agreement and mortgage again, and somewhat different from the first statement. He states, that in the spring of the year 1810, one Jenkins had a judgment and execution against him for six or seven hundred dollars, and that to pay off the same, he applied to James Bryan for the money in the month of May, 1810; that Bryan lent him five hundred dollars, and that to secure the re-payment, he made the mortgage above referred to, and Craig says, at the same time it was agreed between him and Bryan, that inasmuch as Craig was then in the salt making business, and Bryan was merchandizing, that whatever quantity of salt Bryan should send for before or after the five hundred dollars should be advanced, the same should go to the credit of Craig toward redeeming the slaves. That shortly after the arrangement, and before the money was advanced, Bryan sent and got eighty bushels of salt, which salt was to be valued at- the market price, and that salt was worth two dollars per bushel; Craig then charges that the money was a loan, and that the negroes were mortgaged to secure the re-payment, and that it was expressly understood and agreed that he might redeem the slaves at any time ; the bill further charges the delivery of other quantities of salt.
The bill then goes on to state, that Sarah has had large increase;, some four or five children, and that they are now all of great value, and that Bryanhas had possession of the said slaves ever since the mortgage was made, till his death in 1820; that the widow of said Bryan continued on in possession of the same till her intermarriage with James E. Perry in 1825; that he then took possession of the slaves, and still coutinues in possession of the same, and refuses to deliver the same to him although he has offered to pay on said mortgage whatever may be due, and that he is still ready *362 to pay whatever may be due ; he also states that the labor of the slaves is of great value, &c. J. F. Perry and wife answer: the wife knows nothing of the affair; found the slaves in her husband’s possession ; at his death she continued the possession ; her husband died making no will, and that there never has been any administrator. Perry says, he found the slaves in possession of the widow Bryan when he married; that he has found the mortgage mentioned by Craig, and makes exhibit of it; that in the year 1826, he and Samuel Perry purchased the slaves of Timothy M. Bryan, of Philadelphia, for the sum of twelve • hundred dollars, which sum was paid to said Bryan in cash, and that he never had any notice of Craig’s claim till some time after his purchase, and that the first time he ever had any notice of the same, was from Craig, who a short time before the commencement of the suit, called on him and stated his claim to the slaves, and offered to enter into an account in relation to them, which he the defendant rejected ; but that Craig, at that time, neither tendered money to him on account of the contract with J. Bryan, nor did he offer any thing else in discharge of the mortgage, nor was Samuel Perry present; that he found the mortgage among the papers of J. Bryan after much search, having never seen it before; insists that himself and S. Perry are purchasers for a valuable consideration without notice, and also insists on the statute of frauds, and on the statute of limitations. J. F. Perry is appointed guardian for the infant children of J. Bryan, who are made parties; their answer is, that they have no knowledge of the matter.
Samuel Perry says he was acquainted with Craig and Bryan before 1810, and since; that he first saw the negro woman in 1810, in possession of Bryan at his house at Hazle run, in Ste: Genevieve county;- that Craig, and Bryan both-lived in-the same neighborhood ; that he knew the slaves to have continued in possession of Bryan and his family up till 1826, when he bought of T. M. Bryan; that he was often, in the course of business, in the company of George Craig, and that he never heard from Craig or any other person, that Craig had any claim on the negroes; that in 1823 or 24, T. M. Bryan,-of Philadelphia, proposed to sell the said woman and her increase to him, stating that they belonged to him, and that he had purchased them of James Bryan in his lifetime to secure a debt for goods and money borrowed of him, T. M. Bryan, some years before ; that he, S. Perry, then declined purchasing, but afterwards concluded to purchase jointly with J. F. Perry, and accordingly, in 1826, being in Philadelphia, did purchase the said slaves for himself and J. F. Perry for the sum of $1250, which he paid to T. M. Bryan in cash ; and that himself and J. F. Perry, his partner, have kept and enjoyed the slaves ever since. The-hill charges James Bryan was insolvent at and before his death ; as to this, Samuel Perry says he does not know Bryan was insolvent, but thinks if be had lived a few years, he would have paid all his debts, &c., and that he never so much as heard of Craig’s claim till he was sued by Craig; that he denies all confederacy, combination, &c. T. M. Bryan answers and says, that as to- any bargain or mortgage between Craig and James Bryan, and as to any bargain relating to salt, he is entirely ignorant, and further answering says,- that James Bryan was indebted to his father, Guy Bryan, in 1812, in the sum of upwards of $2000 for money advanced to him by said Guy of Philadelphia, that in consideration of this debt, and in part payment thereof, James Bryan made a bill of sale of the slaves to him, for the sum of $1250; he then sets out various particulars relating to the debts, and says that when the slaves were sold to Perrys, the money was- passed to the credit of Guy Bryan ; *363 he insists that he was a purchaser bona fide for a full and valuable consideration without any notice of Craig’s claim, and that he did not hear of the same till he saw Craig’s bill; and farther, he says in 1823, he was in Missouri, and finding the widow of James Bryan in need of help, he left the slaves with her; took a written promise of her to deliver them, &c.; and that in 1826, finding the widow had married and did not any longer need such assistance, on the application of the Perrys, he sold the slaves to them for §1250 as aforesaid. The Perrys also insist that they Were bona fide purchasers without notice. All the defendants insist on the statute of limitations and the lapse of time; several exhibits were made of the deed of mortgage, hills of sale, &c. Replications were put into the answers. S. Perry died, and his executors are made parties. On the trial the complainant proved by Robert Hinckston, in substance, as follows: that witness once had a conversation with James Bryan, from which conversation he understood from Bryan, that a negro woman and child, the woman named Sarah, were put into his hands as a pledge for a sum of money advanced by Bryan to Craig, for which Bryan was to take salt in place of the money loaned to Craig, which was about $600; he thinks in the year 1810 or 1811, some time after the before mentioned conversation with Bryan, witness asked Bryan if Craig was likely to get back or redeem the negroes, Bryan replied as well as witness can recollect, that Craig had let him have some salt towards redeeming them, but the quantity the witness cannot say at this time; that the first conversation was after Craig had let Bryan have the negroes; that at the time Craig borrowed the money of Bryan, he was engaged at the Mississippi saline, in ralsinawater for the salt works. Craig’s wages were one thousand dollars payable in salt, and that Craig was so employed upwards of a year. The general price of salt at the works was, in 1810, two dollars per bushel; that Bryan kept store at the time; that Bryan informed the witness that the negroes were put into his hands till the money or salt was paid up. Salt afterwards fell in price, say the same season, or afterwards. Witness states that about the time, and after one Jenkins obtained judgment against Craig, he became embarrassed ; says the slave Sarah was valuable and is the same sued for. In 1817, Craig removed from that portion of country to the upper country; that Jenkins held Craig as principal, and the witness as surety, in the case where the judgment was, and that witness showed the Sheriff the slave to levy on; believes that Craig in 1810 or 1811, might have paid four or live hundred dollars being then in the employ of Bird, but without that was poor ; says on the question being put, that Craig made the mortgage to Bryan in one of the years 1810, 1811, or 1812. On the question being put, witness says he did not understand from Craig and Bryan, that if the money or the salt was not paid, the slaves were to belong to Bryan; says his recollection and belief is, that both Bryan and Craig told him, if the money or salt was not paid, then Bryan was to keep the slaves. There is testimony that, in May, Bryan got of Craig eighty bushels of salt. One William Hinekson testifies, that in the year 1810, on the 11th of November, he was at the store of Bryan at Hazle run, Craig and Bryan were both in the house, saw the clerk of Bryan counting money in the presence of Craig, knows not who got the money. Craig also proved a letter oí Bryan about April, 1811, wherein he tells Craig he wants no more salt then. This all the testimony material to be noted. The Circuit Court made a decree, that Craig he let in to redeem the slaves, and decreed an account for hire, and that the slaves he delivered over to Craig, as the wages had overpaid the mortgage money, found a balance as against J. F. Perry and the exec *364 utors of S. Perry, &e. To reverse this, the defendants appeal to this Court. The decree is attacked, mainly on the ground, that there is no equity in the hill, and that the plaintiff is barred by the statute of limitations and lapse of time 5 that Perrys are fair purchasers without notice, &c. It is insisted on the part of Craig, by Mr. Gamble, that in this case, as no time was mentioned when the money or salt was to be paid, Craig has his lifetime to do it in, as in the case where one pledges jewels and no time is mentioned for redeeming, the pledgor or the pawnor has his lifetime to redeem in. On the other side, Mr. Bates insists that the time should be reasonable, and whether the time is reasonable or not, depends on the nature of the thing mortgaged. We believe this doctrine will furnish the best rule.
Where no time is mentioned in case of a pledge, in case jewels are pledged, then the pledgor has his lifetime to redeem in, on this condition, that the pawnee may hasten the time by request, and if the pawnor, after request, does not redeem in reasonable time thereafter, the pawnee may sell the pledge and so get his money. In all contracts or mortgages, and of all other kinds, the great point is, what the parties really mean by the agreement.
To ascertain in some instances what was meant, we must not only look at tire words, but we must look to the subject of ibe contract, as if there be a mortgage of a crop of corn in the field, or of one hundred cords of wood in the open air without shelter, and no time is mentioned for redemption, can any one in such case suppose either party expected the time of redemption would continue for the lifetime of the mortgagor ? And again, when the thing in which the redemption is to be made, is of a variable price; thus, when the redemption is to be made in bank stock and at a certain value, and no time is mentioned, the mortgagor ought to redeem while the stock is at a fair value; so where the redemption is to be made, in salt at a price fixed, or any other article which at one time may be marketable and at another time not so. If this reasoning be correct, Craig’s claim to redeem at any time in salt is so unreasonable, that we can scarcely believe it to be true that it was expected by him or Bryan, that Craig had his lifetime to redeem in. Craig mortgaged to Bryan a young negro woman with her first child. It must have been fori seen by both, that if Craig might have twenty or even thirty years, that to give him his lifetime to redeem in, would throw on Bryan an enormous burden, a burden to raise a family of slaves for Craig ,at his expense and risk, without any advantage equal to the undertaking. It would turn him into a slave hirer, when it may be he would not at all be willing tobe a hirer to the extent he is made such in this case. If the question had been propounded to either at the time of making the mortgage, do you mean this, the answer would,.bave been, no. But in answer to this, it is said Bryan might have hastened by demanding redemption; suppose he had done so, and Craig had still neglected, what could Bryan do ? He could not have foreclosed the equity of redemption under the statute, as will be seen by the case of O’Fallon v. Elliott, administrator of Hanly, decided by this Court. There the Court decide the statute would not apply, and they know of no legal remedy to foreclose the equity of redemptien of a chattel at common law. Whether the equity of redemption could be foreclosed in Chancery, or whether, when the time is passed, the estate in a chattel is indefeasible, has not yet been settled. In New York the doctrine is, redemption may he allowed. In this State there has been no decision, and many have doubted. But suppose Craig could redeem after the time for redeeming had elapsed; the question is, what was that time? We think enough is shown to satisfy any one, that *365 Craig was to pay the money or salt within a year, or at all events within two years at most. Craig says he was then engaged in manufacturing salt, and as he had the article, and as it suited Bryan to sell salt at his store, and as he could sell the same on a profit, he agreed with Craig to take salt, from time to time, in lieu of the money, this shows most conclusively what the parties meant as to time. 11 l.kston says Craig was hired hy the year for one thousand dollars per year, payable in salt. The witness further says, Craig remained at that employ one or at most only two years. The bargain was, that Craig was to pay salt and Bryan to receive from time to time. The plain and every day meaning of this is, that as fast as Bryan sold out what he might have on hand, he should call on Craig for more,and Craig was to pay it. It is our opinion that the parties both meant the time for redemption in salt, and in money too, was not to extend beyond the necessary time to sell this salt. Bryan had a store, we know nothing of the largeness of the demand ior salt there, say the parties contemplated one year, or two years, or three years, as the utmost time when all this salt was to be paid; then, that is the time when the mortgage became forfeited. The circumstance that in 1811, Bryan said he did not want any more salt then, has no effect as to the real time of payment intended at the time beginning. We cannot expect that Craig believed or intended he would he always engaged in making salt during his life, nor that Bryan really intended or expected to he for the whole of Craig’s life engaged in salt selling. The utmost time which was contemplated by the parties was not beyond three years. In Juiy, 1814, this estate in the slaves became absolute at law.in Bryan. As to the point, whether there is equity in the bill or not, it is not necessary for us to discuss that, because we think as to whatever equity there may once have been, the plaintiff’s claim is barred by negligence and lapse of time.
Courts of Equity have, in England, and in the United States too, allowed the time fixed by law, in which a right must be pursued, to furnish a bar in equity when the party comes there for redress. Thus, in ejectment, the right of bringing that action in' England was twenty years; so a claim in equity regarding that land, must be prosecuted in equity within twenty years. The first case cited by the appellant, shows what is the rule with regard to mortgages of land, i. e., Cases abridged, 333; there the rule is laid down to be, that equity would not relieve mortgagors after twenty years, for the statute of limitations held it reasonable to limit .e me of one’s entry to that number of years ; and it is farther said, though there is no time limited for redemption of mortgages, yet Courts of Equity discourage the stirring old and dormant claims. In 1 Powel on Mortgages 360-1, the rule is laid down to be, that twenty year’s possession on the part of the mortgagee, and no disability on the part of the mortgagor, is prima fade a bar to the right of redemption. In the case of Demarest et ux v. Wynkoop, 3 John. c. r. 129, it was holden that twenty year’s possession by a mortgagee, is a bar to all equity of redemption. In 6 Peters’ Reports 61, in the case of Miller’s heirs et al v. McIntyre, the Supreme Court of the United States decide, that the Court in Kentucky and elsewhere, by analogy, apply the statute of limitations in chancery to bar an equitable right when at law it would be barred. The statute operates when the titles are adverse in their origin, and no reason is perceived why this rule should not he applied in equity. By these authorities it is clear enough that the rule in equity is that when the mortgagee or person to whom the land or chattel was mortgaged has had the thing so long that no action at law could he brought against him by reason that the statute of limitations would bar *366 his right, there equity will not disturb that possession and will not allow the party to redeem, we see no reason why this rule should not be applied to Craig’s claim.
It is a rule as old as Courts of Equity, that negligence and lapse of time will form objections to a complainant’s right in all cases ; no matter whether founded on a mortgage, equity of redemption, or other matters of equity. On the part of Craig, we are referred to several authorities to controvert the doctrine attempted to be raised against him, 1 Wash. R. 17, Ross v. Norvell, and a late decision of the Court of Appeal of Kentucky, 7 J. ch. R. 113, 125; 3 do. 216. The case of Ross v. Norvell, 1 Wash. R., appears to be a case of this sort. The complainant on the 5th April, 1779, filed his bill praying to redeem certain negroes which had been mortgaged in 1765, to secure the payment of a debt due by him ; the slaves were conveyed by an absolute bill of sale in June 1765, with a warranty, and a receipt for the consideration stated in the deed, was written on the back of the deed; the bill says, the deed though absolute on the face, was only a security, and that it was verbally agreed that the plaintiff might redeem at any time. The answer insists the sale was absolute, and was intended as a satisfaction of a prior debt j as to the evidence there was some contrariety. The Chancellor decreed the redemption. It was, among other things, objected, on the hearing of an appeal taken, that time, in this case, formed a bar to the redemption. The Court say in the case, that the time allowed for bringing an action of detinue in that case was not barred by the statute; they then go into a computation to show how much time had elapsed. The Court in the case are,.of opinion, that the ground on which the bar in equity arises, is not justly put on the analogy to the statute of limitations ; but on the presumption that arises from lime and negligence ; this is said by way of argument, as the Court had already decided the time for bringing the action of detinue had not expired, and they 'deny that the statute of limitations furnishes the true rule. The Supreme Court of the U. S. in the case of Miller’s heirs et al v. McIntyre et al, 6 Peters’ Reports 61, entertain a different opinion. The case of Kane v. Bloodgood, 1 J. ch. R. 111, is cited to show that technical trust created by equity, are not within the statute of limitations. The cases put by Chancellor Kent are cases which, he says, cannot be sustained by modern decisions. One case is, where money has been received in such manner that an account would be necessary; in that case, he who receives the money is a trustee in equity for the person whose money has been received. Chancellor Kent says, according to this, every person who receives money to another use, is put out of the protection of the statute, if the parly elects to sue him in chancery instead of suing at law; the case goes- on to say in page 113, the first case that gave any thing like precision to the definition of a trust not within the statute of limitations, was that of Lackey v. Lackey, (Rec. in Chan. 518,) that was an account for the profits of an estate received while the plaintiff was an infant, and a bill was not filed until six years after he came of age. The Lord Chancellor Macclesfield was clearly of opinion, “ that when one receives the profits of an infant’s estate, and six years after coming of age, he brings a bill for an account, the statute of limitations was a bar to such suit, as it would be to an action of account at common law'. The case then goes on to laydown the rule to be, that whenever the party, would be barred at law if he brought his action there for the same thing for which he sues in equity, he is also barred in chancery. 3 Johnson 'Chan. 216, has been cited to show the statute cannot apply in this case; there we find it said by Chancellor Kent, that no time will bar where there is a direct trust, as between the trustee and cestui que trust; and accordingly he cites a case, *367 Cholmondely v. Clinton, 2 Merivale 360, where it was decided that so long as a trust subsists, the right of the cestui que trust is not affected by the statute of limitations. The case then goes on to put the cases of executors and administrators, as cases furnishing trusts not barred by the statute; as where the next of kin called on the administrator to pay the surplus, the administrator could not avail himself of lapse of time, (317 same case.) Another case has been cited from a manuscript report decided lately by the Court of Appeals of Kentucky; without stopping to examine the reasons of that case, we will only say that so far as that case is contrary to the cases cited above for the appellants, we are not prepared to let it overrule the many settled and established authorities laid before us. As to the case in 1 Washington, we have already shewn that the case was decided on the ground the time had not run out. Upon this view of the authorities on both sides, we are clearly of opinion that Craig’s claim is barred by the statute of limitations and lapse of time. It is of the utmost importance to the property, peace and welfare of the people that such a,limitation should exist in chancery as well as at law. Chancery Courts have long ago, as we think, established this rule, and we are not at liberty, if we would, to disregard it now. Craig, however, to escape from the effects of this rule, has alledged that he was poor and unable to raise the money to pay the balance due within the time he would have had before his claim was barred. This argument so far as respects his poverty probably was true, but so far as respects that being the reason why he did not redeem it, is a suspicious argument.
The fact of poverty has never yet been allowed as an excuse why a party should not sue in time. Let us look into the truth of this argument; we have said the statute began to run on Craig in 1814, July 10th. Detinue then as an action, had no limitation ; in 1818 it was limited to five years; then at any rate, if not before, the statute began to run on Craig ; in 1823 the time was out. In 1823, it is believed by us that from the testimony as to the age and value of Dick, the child mortgaged, he was worth the balance of the money due in 1822. When the time was about to close on Craig -forever, Dick was 12 or 13 years of age. Craigmight then have sold him, or him andanother child, to pay the balance of the mortgage, and have redeemed the balance of the slaves. He seems never to have thought of this resource which was most obvious, especially to a man whose other resources were said to be straitened. The circumstance that he made no attempt to do so, and also the circumstance that in 1817, he left that part of the country entirely, furnishes strong arguments in favor of the usefulness of the statute of limitations which proceeds on the ground that within the time fixed for bringing suits, a case may well be supposed to be settled and the witnesses dead, who could testify as to the settlement. Craig stands in this condition ; his equity of redemption is supposed to have been extinguished if he ever had any, and the length of time is supposed to have swept off the witnesses who could have proved it, and he cannot now be permitted to disturb the present possessors of the property-. Time began to run against Craig in 1S18 at all events, and it is a rule that when time begins to run on a man’s right, it sweeps on regardless of the death of the claimant or the person against whom the claim is. According to this view of the subject, the decree of the Circuit Court must be reversed, &c.