SPEIDELL *v.* HENRICI and others, Trustees, etc.*

(*Circuit Court, W. D. Pennsylvania.* February 28, 1883.)

1. EQUITY—LIMITATION OF SUITS.
    Courts of equity refuse to interfere where the suitor has allowed a considerable lapse of time before bringing his action, from considerations of public policy and from the difficulty of doing justice, when the original transactions have become obscured by time and evidence is lost.

2. SAME—DILIGENCE AN ESSENTIAL CONDITION TO EQUITABLE RELIEF—LACHES.
    A suitor in equity is required to be "prompt, eager, and ready" in the pursuit of his rights. Diligence is an essential condition of equitable relief, and laches and negligence are always discountenanced.

3. SAME—TRUSTS—OPERATION OF LAW OF LACHES.
    Where a valid express trust has been created, and is recognized or treated by both parties to it as subsisting, mere delay upon the part of the *cestui que trust* may not defeat his remedy for the enforcement of his rights under the trust; but when a trustee denies the right of the *cestui que trust,* and his relation to the latter in respect to the trust property becomes adverse, from that time the right of the *cestui que trust* to relief is subject to the operation of the law of laches.

In Equity.

*John Barton, H. Markworth,* and *Wm. Reinecke,* for complainant.

*George Shiras, Jr.,* and *C. S. Fetterman,* for defendants.

Before McKENNAN and ACHESON, JJ.

McKENNAN, J. This bill is filed by Elias Speidell, a citizen of the state of Ohio, against Jacob Henrici and Jonathan Lenz, as trustees of the Harmony Society, located in Beaver county, Pennsylvania. It alleges—

That the complainant's father and mother resided in the kingdom of Wurtemberg, Germany, up to about the year 1804, were engaged in farming, were without any education, but were devout Christians and members of the established Protestant church of the country, and earnest seekers after spiritual light and their own salvation. That, at the same time, one George Rapp lived in the same neighborhood and was a man of education superior to that of the simple farming people, " of great intellectual power, clear-sighted, sharp-witted, eager for superiority, and a born leader of men." That about the year 1800 the said Rapp began to preach clandestinely to many of his fellow-countrymen, including the complainant's parents, that the Lord had chosen him as their spiritual leader; that the second advent of Christ and the beginning of the millenium, as taught by the revelation of St. John, were near at hand, and that in order to be saved from eternal damnation it was necessary for them to separate from the established church of their country and to form a settlement of themselves under his guidance and control. That by means of his preaching and personal influence over his disciples he caused about 300

*Affirmed. See 7 Sup. Ct. Rep. 610.

families of them to separate from the established church and to believe in and
accept him as their only spiritual leader and a necessary medium of their sal-
vation. That he impressed them with the belief that it was necessary for
their salvation that they should convert all their possessions into cash, leave
their country, and, as the chosen of the Lord, form a colony by themselves in
the Holy Land or in the United States of America, in which places Christ
would first reappear on earth. That accordingly about 125 families sold all
their land and possessions for cash, emigrated to the United States and settled
in Butler county, Pennsylvania, upon a wild, uncultivated tract of land
selected by him at Harmony, where the complainant was born in the year
1807; and there they founded a colony or voluntary association, called and
known as the "Harmony Society," and became wholly subject to the absolute
power and control of said Rapp in both temporal and spiritual affairs. That
before their arrival at Harmony the heads of families had severally paid their
own expenses and kept separate their own means, but that said Rapp fraud-
ulently pretended to his followers that they could not escape eternal damna-
tion unless they would renounce their mode of living in separate and ex-
clusive homes for each family, and yield up all their possessions, as had been
done by the early Christians, and intrust them to him as their apostle, "to be
placed in a common fund of said Harmony Society in the keeping of said
Rapp as their trustee," and would live henceforth as a community, doing
such work for it as he should direct, "the avails thereof to form part of said
common fund," investing him and his successors with the leadership of said
community, the management of all said trust funds, and the disposition of
themselves and of their wives and children, they to receive in return only the
necessaries of life. That accordingly the parents of the complainant, "in the
year 1805, yielded up all their possessions to the said common fund of said
Harmony Society," contributing thereto about $1,000, and thenceforth lived
in a common household with the rest of said Rapp's followers, submitting
themselves to his control "to do such work for said community as he directed,
and allowed the avails thereof to form part of said common fund," receiving
only the necessaries of life in return; "for none of which they or any of them
ever received or were promised any other consideration than the pretense that
by complying with the teachings of said Rapp they would not be damned,"
and that they would be led by him to eternal salvation. That said Rapp re-
ceived and accepted said trust fund and its accretions, "not as his own,
in trust for the members of said families and the contributors to said fund,
and for their common benefit," and always acknowledged said trust and
disclaimed any greater interest therein than that of any other contributor
thereto, or any other right to the management and control thereof than by
virtue of his apostolic leadership of said community. That about the year
1807 he fraudulently and corruptly pretended to his followers "that there had
been no difference of the sexes, nor any seed of death in man, until both were
brought about by original sin;" "that all intercourse of the sexes, even in
wedlock, was polluting, and that they could not and would not be saved from
eternal damnation except by adjuration of matrimony and of all sexual in-
dulgence by those of his followers who were single, and by a cessation of all
conjugal intercourse by those already married." That accordingly thence-

forth all the married and single members of said community abjured all sex-
ual indulgence and lived as if single. That the complainant was reared in
and as part of said community, and was, from his earliest infancy, taught to
believe, and accepted as true, the doctrines aforesaid propounded by said Rapp,
and consistently practiced the same. That from the time he reached the age
of 12 years until he was 24, a period of 12 years, he contributed his labor to
said trust fund and received nothing in return save the necessaries of life.
That the said contributions of the complainant to the common fund, deduct-
ing his subsistence, are largely in excess of the sum of $500, and that by in-
terest and profits they now largely exceed the sum or value of $30,000. That
about the year 1815 the said community removed to Posey county, Indiana,
where, about the year 1816, the complainant's parents died, and that about
1825 it removed to Beaver county, Pennsylvania, the complainant still being
a member of it, and that it remains there now. That said Rapp ruled over
said community from 1805 until his death in 1847, exercising absolute domin-
ion over all its affairs. That, in order to keep the members of the community
in "an ignorant and degraded condition," he interdicted the acquirement of
any knowledge of the English language by them, or access to books in that lan-
guage, or association with any but inmates of the community. That in the
year 1818 the said Rapp destroyed the records of the original contributions to
said trust fund in 1805, to prevent any knowledge coming to the younger
members of the community, and that he studiously concealed from the con-
tributors "all money transactions made by him, and habitually destroyed the
records thereof." "That the whole of said system of said Rapp was repug-
nant to public policy and the laws of the land, and more especially in this:
that no inmate of said community was permitted by said Rapp to marry
therein, and that whoever was about to enter into the married state was com-
pelled by said Rapp to leave said community; and that the complainant, in
the year 1831, being about to enter into the married state, had to leave and
did leave said community, though said Rapp did permit, as an exception, a few
of his favorites to marry in said community, and to remain therein; and until
the complainant so left said community he was kept under such duress and
restraint by the iron rule of said Rapp that he did not know and had no
means of ascertaining the iniquity and degradation thereof, and the impious
and blasphemous character of the teachings of said Rapp." That said trust
fund now exceeds in value $8,000,000, and the net profits thereof have for
many years exceeded the sum of $200,000. That, at the death of said Rapp,
Romelius L. Baker and Jacob Henrici succeeded him as trustees of said trust.
That on the death of said Baker, in 1868, he was succeeded by Jonathan
Lenz; and that said Jacob Henrici and Jonathan Lenz are now the trustees
and managers of all the estate of said Harmony Society, and now acknowl-
edge said trust, and disclaim any greater interest therein than any other con-
tributor to said trust fund.

And the bill prays—

That the trust be rescinded as resting upon fraud and iniquity, and as being
contrary to public policy and the laws of the land; that the persons interested
in its assets be remitted to their original rights; that discovery be made of

the names and places of abode of the other persons interested in the assets; that an account be taken of the trust funds, and the complainant's share therein; that he have compensation for his contributions to the trust fund; and that a distribution of said trust funds be had.

To this bill the respondents have demurred for the following causes:

(1) That the cause of complaint is barred by the statute of limitation; (2) that the causes of complaint are stale, and ought not, therefore, to be taken cognizance of; (3) generally that no case is stated for relief.

It is to be noted that the foundation of the complainants' claim to relief is his alleged membership of the Harmony Society, and the performance of work and labor in its behalf for a period of 12 years prior to 1831, amounting in value to a sum exceeding $500. In that year he severed his connection with the society, thus emancipating himself from the bondage in which he had been held, and was entirely free and competent to assert his legal rights. If he wished to obtain compensation for his labor, an action at law was *then* available to him to recover it. If he desired to assert a claim upon the property of the Harmony Society, as one of its beneficiaries, a court of equity was *then* open to him for the administration of appropriate relief. But he rested in entire inaction for more than 50 years, not even having made a demand upon the society, in any form, until the seventh of May, 1882.

And it is also to be noted that, for 17 years after the scales fell from his eyes and he was convinced that marriage was not a mortal sin, during the life of Mr. Rapp, against whose character and memory the most vigorous epithets of reproach are directed with unsparing reiteration, he made no movement whatever to obtain an account of the trust and of his own interest in it. And yet Mr. Rapp, as the founder of the society and of the trust, and the sole manager of all its business, was peculiarly capable—if he was not the only person who could do so—of furnishing all required information touching all its affairs, and especially of the nature, condition, and administration of the trust. Besides, the complainant does not seek compensation for his labor alone—for that he might have been remitted to his legal remedy; but the fundamental prayer of his bill is that the trust be abrogated as founded in imposture and hence unlawful in its beginning; and yet for 50 years he was quiescent.

Ought the bill, then, to be entertained?

A suitor in equity is required to be "prompt, eager, and ready" in the pursuit of his rights. Diligence is an essential condition of equitable relief, and unexplained negligence is never encouraged.

"Nothing can call forth a court of equity into activity but conscience, good faith, and reasonable diligence. When these are wanting, the court is passive and does nothing. Laches and negligence are always discountenanced, and, therefore, from the beginning of this jurisdiction, there was always a limitation of suits in this court." *Smith* v. *Clay*, Amb. 645, quoted with approval in *Brown* v. *County of B. Vista*, 95 U. S. 160.

So, also, says Mr. Justice SWAYNE in the case last referred to:

"The law of laches, like the principle of the limitation of actions, was dictated by experience, and is founded in a salutary policy. The lapse of time carries with it the memory and life of witnesses, the muniments of evidence, and other means of proof. The rule which gives it the effect prescribed, is necessary to the peace, repose, and welfare of society. A departure from it would open an inlet to the evils intended to be excluded."

And again:

"Courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy, from the difficulty of doing entire justice, when the original transactions have become obscure by time, and the evidence may be lost, and from the consciousness that the repose of titles and the security of property are mainly promoted by a full enforcement of the maxim, *vigilantibus et non dormientibus jura subserviunt.*" 1 Story, Eq. Jur. § 529.

Unless, then, these principles of law are inapplicable to the present case, the complainant has lost any title to relief which he may have had. It is urged that this is an express, continuing, and subsisting trust, and that, therefore, no lapse of time will impair the complainant's right to relief. Such a trust is set up in the bill, and the demurrer admits it to be of that character; and we must, therefore, so treat it.

But it is alleged to have been an imposture, and unlawful in its inception, and the main relief sought is that it be "rescinded and held for naught" on that ground. Was, then, there no duty of diligence on the part of the complainant under these circumstances? This is forcibly answered by Judge WOODWARD in *Price's Appeal*, 4 P. F. Smith, 482:

"And if he had gone for rescinding it, and had convinced the court that it was a catching bargain that ought not to be enforced against him, still he would have encountered that principle of equity that refuses relief to stale demands, and which requires conscience, good faith, and reasonable diligence in parties complainant. In *Roberts* v. *Tunstall*, 4 Hare, 262, the vice-chancellor assumed that the deed in question there might have been impeached on both grounds assumed against it, if the transaction had been of recent occurrence, but on the authority of several cases refused to interpose after 18 years delay to sue, and declared that the principle of the decisions is, that after so

. great delay the injured party must be held to have waived his right to relief,—
a principle which presupposes a right to set aside the transaction independ-
ently of that fact."

Doubtless, where a valid express trust has been created, and is
recognized or treated by both parties to it as subsisting, mere delay
on the part of the *cestui que trust* may not defeat his remedy for the
enforcement of his rights under the trust. But there is abundant
authority for the statement that when a trustee denies the right of
the *cestui que trust*, and his relation to the latter, in respect of the
trust property, becomes adverse from that time, the right of the *cestui
que trust* to relief is subject to the operation of the law of laches. 7
Johns. Ch. 90.

The trust alleged here was instituted for the equal and exclusive
benefit of the members of the Harmony Society. It was part of the
religious as well as secular polity of the society. Fellowship in the
society was the only recognized title to participation in its benefits.
When that fellowship ceased, from whatever cause, all further inter-
est in the trust and all the privileges of membership were necessarily
lost and were denied. From that time forth the relations of the
withdrawing member and the society, as to all the incidents of mem-
bership, were adverse. This was the attitude of the complainant and
of the society towards each other. He adjured a tenet of its religious
creed, and proposed to violate one of its fundamental rules. He was,
therefore, compelled to leave it, and thenceforth ceased to exercise
any of the privileges or to enjoy any of the benefits of membership,
but was, as to all these, placed in adverse relations with it. And
yet, for more than 50 years, he acquiesced in this hostile denial of
his right, never questioning the validity of the trust, or making any
claim to a participation in it. Negligence such as this, so long-con-
tinued and so expressive, must be considered as a waiver of his right
to relief.

We do not discuss or consider the first and third causes of de-
murrer, because we regard the second as decisive of the case. The
demurrer, therefore, is sustained upon the second cause assigned,
and the bill must be dismissed with costs; and it is so ordered.

---

EXPRESS TRUSTS. It is generally true that statutes of limitation do not
apply to express and continuing trusts. These are not cognizable at law but
only in equity, and there the trustee cannot, during the continuance of the

fiduciary relation, set up the statute of limitations against his *cestui que trust.(a)* Nor are direct and continuing trusts barred in equity by any rule as to laches, or lapse of time analogous to statutory rules of limitation at law. Lapse of time is no bar to enforcing a trust admitted or proved to be continuing and in existence.(b) But the general rule just stated is subject to exceptions in three classes of cases, wherein the statute of limitations or lapse of time will bar even an express trust (1) where there is a concurrent remedy at law in which there is a fixed limitation; (2) where there is an open denial of the trust, with notice, which requires action by the *cestui que trust*, and afterwards a lapse of time which would amount to a bar in law; (3) where there are circumstances shown which, with lapse of time, raise a presumption that the trust has been extinguished.(c)

If the trustee denies the right of the *cestui que trust*, and claims adversely to him, this amounts to an abandonment of the fiduciary character. It is a renunciation of the trust. So where there is a settlement and a receipt given by the *cestui que trust* to the trustee. The trust ceases as to all matters prior to the settlement. And from the date of renouncing the trust, or of settling and balancing its accounts, time begins to run against the *cestui que trust*, during which his silence and acquiescence may operate to bar his rights if he finally undertakes to assert them, either at law or in equity.(d)

Great delay in seeking to enforce a trust will always have great weight against the trust, especially where the nature and character of the trust has become obscure, or the acts of the parties or other circumstances give rise to presumptions against it.(e) But the question, does a trust exist? must always depend upon the nature of the trust, the relative situation of the parties to the subject-matter of the trust, their relations to each other, and upon all concomitant circumstances, of which lapse of time is but one.(f) Among the cases wherein lapse of time has largely determined the court to hold that no trust has been established, or that the trust established was different from that claimed or was barred by lapse of time, are the following: Where, in the absence of bad faith, rent was received by trustees instead of interest at the ordinary rate (which interest would have amounted to more than the rent) for a period of 80 years, ending more than 20 years before suit was brought, it was decided that the rent must be deemed a substitution and satisfaction for such interest during the same period.(g) In *Mumford* v. *Murray*(h) the representatives of one *cestui que trust*, under a conveyance in trust to pay debts, filed a bill for an account against the trustee. He objected that certain creditors, *cestuis que trust* under such deed, should have been made parties to the bill. But it appeared that no claim had been made by such creditors for 20 years, during which time the trust fund had been almost constantly in controversy, and the trustee defendant had repeatedly stated to the

(a) Lawson v. Blodgett, 20 Ark. 195; Young v. Mackall, 3 Md. Ch. 398; Fishwick v. Sewell, Har. & J. 393; Shibla v. Ely, 6 N. J. Eq. 181.

(b) McDonald v. Sims, 3 Ga. 383; Dow v. Jewell, 18 N. H. 340.

(c) Paschall v. Hinderer, 28 Ohio St. 568.

(d) Murdock v. Hughes, 15 Miss. 219; Williams v. First Presby. Soc. 1 Ohio St. 478; Dean v. Dean, 9 N. J. Eq. 425; Wellborn v. Rogers, 24 Ga. 558.

(e) Taylor v. Blair, 14 Mo. 437; Mitchell v. O'Neil, 4 Nev. 504; Robertson v. Maclin, 3 Hayw. 70.

(f) Dean v. Dean, 9 N. J. Eq. 425; Atty. Gen. v. Old South Soc. 13 Allen, 47 t.

(g) Atty. Gen v. Old South Soc. 13 Allen, 474.

(h) 6 Johns. Ch. 1.

plaintiff that such creditors had been satisfied. It was decided that the defendant was precluded from making the objection.

An assignment by an administrator to his individual creditor of choses in action belonging to his intestate, without any actual fraud, may raise a constructive trust on the part of the creditor; but a court of equity will not declare it to exist after a lapse of 20 years from the time when the transaction became known.(i) Where 70 years had elapsed since a sale of stock alleged to have been in trust for a person dead at the time of filing the bill, who was not ignorant of nor deceived as to the facts, and who never claimed under the alleged trust, it was held that equity would not interfere to establish the trust.(j) So, where a party abandons or refuses to acknowlege a trust and holds land adversely, the statute of limitations will run against claimants to such land in equity as well as at law.(k) Where three several holders of notes secured by a trust mortgage severally bought parcels of the mortgaged land sold on execution under a paramount judgment, and a holder of other notes secured by the mortgage, who knew of the purchases, after waiting nine years, brought suit to charge such purchasers as trustees, his claim was held barred by laches.(l)

Instances of the enforcement of trusts, notwithstanding the lapse of long periods of time, are the following: While a son was absent and his whereabouts unknown, his mother became his guardian and received his estate. Upon her death her distributees took it with knowledge of the manner in which she held it, and agreed to hold it subject to the claim of the son or his representatives. The latter subsequently claimed the property and it was decided that the distributees took it subject to the trust in favor of the son, and, not holding it adversely, could not set up the statute of limitations, and that they were liable for profits.(m) In *Griffin* v. *Macaulay*(n) it is decided the *cestui que trust* (creditor) under a deed, whose interest thereunder was admitted, was not guilty of laches because he did not compel an account by suit from the trustees for more than 20 years after the deed was made, and then permitted the suit to abate, and did not file another bill until after the lapse of another 20 years.

Under an agreement between and A. and B. in 1837, B. took a transfer of a land certificate to hold one-half in trust for A. The patent was issued in 1847, and B. acknowledged the trust in 1848. The first act of hostility to A.'s claim was the sale of the land by B.'s administrator in 1852, and the suit to enforce the trust was begun in December, before the payment of the purchase money. It was decided that the claim was not stale.(o) Land of a debtor was sold under a deed of trust, in the absence of the trustee, and bought by a creditor for one-half its value, who took possession at once, making no improvements, and holding the property five years and a half, receiving a large rental. It was decided that this period of delay did not cut off the debtor's right to redeem.(p) Where some of the devisees of an undivided tract of land re-

(i) Morris v. Duke, 2 Pat. & H. 462.

(j) Halsey v. Tate, 52 Pa. St. 311.

(k) Baumer v. Straup, 21 Md. 328; Merriam v. Hassam, 14 Allen, 516; Marr v. Chester, 1 Swan, 416.

(l) Knox v. Randall, 21 Minn. 479.

(m) Moor v. Shepard, 2 Duv. (Ky.) 123.

(n) 7 Grat. 476.

(o) Hodges v. Johnson, 15 Tex. 57.

(p) Spurlock v. Sproule, 72 Mo. 503.

covered possession of the whole tract in an action to which the rest of the devisees were not made parties, it was held that the heirs of the latter devisees, who brought suit to recover the shares of their ancestor within a short time after they had knowledge of their interest in the land, were not barred, though about 18 years had elapsed since the first devisees had entered into possession.(*q*) Where a bill shows an undoubted equitable title in the complainants, and seeks a divestiture of the outstanding naked legal title in the heirs of the deceased trustee, a defendant who is alleged to be in possession, and committing waste, but whose possession is not shown to be hostile to the complainants, cannot set up the staleness of the complainants' demand, though it appears to be more than 30 years old.(*r*)

CONSTRUCTIVE TRUSTS. In cases involving constructive trusts a different rule prevails. Lapse of time, especially when coupled with occupancy and improvement of the property by the alleged trustee, has been held a bar to the enforcement of a resulting trust in many cases, even though the fraud was evident, and the right to relief originally clear.(*s*) The following periods of time have been held to bar actions to establish and enforce resulting trusts: 17 years;(*t*) 19 years;(*u*) 20 years a bar;(*v*) 21 years;(*w*) 25 years;(*x*)

(*q*) Hume v. Long, 53 Iowa, 299.

(*r*) Shorter v. Smith, 56 Ala. 208.

(*s*) Sunderland v. Sunderland, 19 Iowa, 325; Newland v. Early, 3 Tenn. Ch. 714; Trafford v. Wilkinson, 3 Tenn. Ch. 701; Douglas v. Lucas, 63 Pa. St. 11; Hall v. Doran, 13 Iowa, 368; Best v. Campbell, 62 Pa. St. 478; Brown v. Guthrie, 27 Tex. 610; Strempfler v. Roberts, 18 Pa. St. 283; Robertson v. Macklin, 3 Hayw. 70; Buckford v. Wade, 17 Ves. 97; Delane v. Delane, 7 Bro. P. C. 279; Clegg v. Edmonson, 8 De G., M. & G. 787; Groves v. Groves, 3 T. & J. 172; Peebles v. Reading, 8 Serg. & R. 484; Graham v. Donaldson, 5 Watts, 471; Haines v. O'Connor, 10 Watts, 315; Miller v. Blose, 30 Grat. 744; Jennings v. Shacklett, 30 Grat. 765; King v. Purdee, 96 U. S. 90; Midner v. Midner, 26 N. J. Eq. 299; Smith v. Patton, 12 W. Va. 541; Harden v. Parsons, 1 Ed. 115; Villines v. Norfleet, 2 Dev. Eq. 167; Portlock v. Gardner, 1 Hare, 594; Beckford v. Wade, 17 Ves. 97; Chalmer v. Bradley, 1 J. & W. 59; Cholmondely v. Clinton, 1 J. & W. 151; Smith v. Clay, 3 Bro. Ch. 639; Hawley v. Cramer, 4 Cow. 117; Dobson v. Racey, 3 Sandf. Ch. 61; Powell v. Murray, 3 Edw. Ch. 641; Anderson v. Burchell, 6 Grat. 405; Colman v. Lyne, 4 Rand. 451; Irvine v. Robt, 3 Rand. 549; Gould v. Gould, 3 Story, 516; Hough v. Richardson, 3 Story, 659; Veasie v. Williams, 8 How. 134; Hallett v. Collins, 10 How. 174; Wagner v. Baird, 7 How. 234; McKnight v. Taylor, 1 How. 161; Piatt v. Vattier, 9 Pet. 405; Andrew v. Wrigley, 4 Bro. Ch. 124; Blennerhassett v. Day, 2 B. & B. 118; Gregory v. Gregory, Cowp. 201; Jac. 631; Selsey v. Rhodes, 1 Bligh, N. S. 1; Champion v. Rigby, 1 R. & M. 539; Ex parte Granger, 2 Deac. & Ch. 459; Collard v. Hare, 2 R. & M. 675; Norris v. Neve, 3 Atk. 38; Pryce v. Byrn, 5 Ves. 681; Morse v. Royal, 12 Ves. 355; Medlicott v. O'Donnell, 1 B. &

B. 156; Hatfield v. Montgomery, 2 Port. 58; Bond v. Brown, 1 Harp. Eq. 270; Edwards v. Roberts, 7 Sm. & M. 544; Peacock v. Black, Halst. Eq. 535; Steele v. Kinkle, 3 Ala. 352; Smith v. Clay, Amb. 645; Bond v. Hopkins, 1 Sch. & Lef. 413; Hovenden v. Annesley, 2 Sch. & Lef. 630; Stackhouse v. Barnston, 10 Ves. 466; Ex parte Dewdney, 15 Ves. 496; Kane v. Bloodgood, 7 Johns. Ch. 93; Dexter v. Arnold, 3 Sumn. 152; De Couche v. Savetier, 3 Johns. Ch. 190; Murray v. Coster, 20 Johns. 576; Provost v. Gratz, 6 Wheat. 481; Hughes v. Edwards, 9 Wheat. 489; Elmendorf v. Taylor, 10 Wheat. 168; Miller v. McIntire, 6 Pet. 61; Sherwood Sutton, 5 Mason, 143; Williams v. First Presby soc. 478.

(*t*) Baker v. Read, 18 Beav. 398; Emerick v. Emerick, 3 Grant, 295; Hite v. Hite, 1 B. Mon. 177.

(*u*) Bruce v. Child, 4 Hawks, 372.

(*v*) Norris' Appeal, 71 Pa. St. 124; Walker v. Walker, 16 Serg. & R. 379; United States Bank v. Biddle, 2 Pars. Eq. 31; Perry v. Craig, 3 Miss. 525; Field v. Wilson, 6 B. Mon. 479; Thompson v. Blair, 3 Murphy, 593; Ward v. Van Bakkelen, 1 Paige, 100; Farr v. Farr, 1 Hill, Eq. 391; Bruce v. Child, 4 Hawks, 372; Ferris v. Henderson, 12 Pa. St. 54; McDowell v. Goldsmith, 2 Md. Ch. 370; Smith v. Clay, 3 Bro. Ch. 639n; Hovenden v. Annesley, 2 Sch. & L. 636; Stackhouse v. Barnston, 10 Ves. 466; Pryce v. Byrn, 5 Ves. 681; Bright v. Legerton, 29 Beav. 60; 2 De G., F. & J. 606; Hodgson v. Bibby, 32 Beav. 221; Browne v. Cross, 14 Beav. 105; Re McKenna, 13 Ir. Eq. 239; Clanricarde v. Henning, 30 Beav. 175; Scott v. Haddock, 11 Ga. 258; Obel v. Bishop, 1 De G., F. & J. 137.

(*w*) Selsey v. Rhoades, 1 Bligh, N. S. 1.

(*x*) Blennerhassett v. Day, 2 B. & B. 118.

27 years;(y) 30 years;(z) 38 years;(a) 40 years, and the death of all the parties;(b) 46 years;(c) 50 years.(d) On the other hand, the following lapses of time has been held not to be a bar: 11 years;(e) 12 years;(f) 18 years.(g)

The true view is that the lapse of time is only one circumstance of the many from which the conclusion of laches must be drawn. Each case is to be determined by its own facts.(h)

EXCUSES. The lapse of time or laches which will bar the enforcement of a trust may be excused; as, for example, by lack of knowledge on the part of the *cestui que trust*, his absence from the country, his disability, such as infancy, insanity, or coverture. The delay may even have been caused by the defendant himself, in which case it is, of course, no bar to the action.(i) Mere lapse of time will not bar infant heirs from relief on a constructive trust originating in fraud. In this case the three children of the intestate were all under 12 years of age at the time of the administrator's fraudulent sale of the land of the deceased, through a by-bidder, to himself in 1844. The administrator remained in possession until his death, in 1859. Against his devisee the three heirs, in 1861, brought a bill for a reconveyance, and an account of the rent and profits. There was no showing of the date of their discovery of the fraud or of acquiescence in the wrong, but a presumption arose from their age, sex, and distant locality that there was no such laches as would bar relief.(j) And even children must act with reasonable promptness. If a child, seeking to enforce against a parent a trust resulting from a conveyance from the child to the parent, obtained by the parent's exercise of improper influences, waits until the parent has died, or until third parties have acquired rights, the remedy will be barred by lapse of time and laches.(k) But want of evidence is not an excuse for delay after notice ; (l) nor is poverty and inability to prosecute any excuse.(m)

Receipt of a part of the property due from the trustee is not a waiver of the rights of the *cestui que trust* to the whole of the trust property.(n) Nor is mere neglect to sue for a few years a bar.(o) And a *cestui que trust* must

(y) Hayes v. Goode, 7 Leigh, 486.

(z) Harrod v. Fountleroy, 3 J. J. Marsh, 548; Bond v. Brown, Harp. Eq. 270 ; Page v. Booth, 1 Rob. Va. 161; Phillips v. Beldon, 2 Edw. Ch. 1.

(a) Powell v. Murray, 10 Paige, 256.

(b) Prevost v. Gratz, 6 Wheat. 481.

(c) Maxwell v. Kennedy, 8 How. 210.

(d) Anderson v. Barwell, 6 Grat. 405.

(e) Mulhallen v. Murum, 3 Dr. & W. 317.

(f) Newman v. Early, 3 Tenn. Ch. 714; Butler v. Haskell, 4 Des. 651.

(g) Grisby v. Mousley, 4 De G. & J. 78; Bell v. Webb, 2 Gill, 263.

(h) Michoud v. Girod, 4 How. 561; Wafford v. Wilkinson, 3 Tenn. Ch. 701; Boone v. Chiles, 10 Pet. 177; Pyce v. Byrn, 5 Ves. 681; Carpenter v. Canal Co. 35 Ohio St. 307; Provost v. Gratz, 6 Wheat. 481.

(i) Sears v. Shafer, 6 N. Y. 268; Richardson v. Jones, 3 G. & J. 163; Doggett v. Emerson, 3 Story, 700; Callendar v. Collgrove, 17 Conn. 1; Phalen v. Clarke, 19 Conn. 421; Henry Co. v. Winnebago, 52 Ill. 299; Hallett v. Collins, 10 How. 174; Rider v. Bickerton, 3 Swans. 81n; Michoud v. Girod, 4 How 561; Ferris v. Henderson, 12 Pa. St. 49; Pickett v. Loggan, 14 Ves. 215; Purcell v. Mc-Namara, Id. 91; Aylewood v. Kearney, 2 B. & B. 263; Murray v. Palmer, 2 Sch. & Lef. 487; Warner v. Daniels, 1 W & M. 111; Bowen v Evans, 2 H. L. Cas. 257; Trevelyan v. Charter, 11 Cl. & Fin. 714; Napton v. Leaton, 71 Mo. 358. See Henry v. Conn, 12 Ohio, 193; Geaton v. Geaton, 4 Bradw. 579.

(j) Miles v. Wheeler, 43 Ill. 123.

(k) Taylor v. Taylor, 8 How. 201; Brown v, Carter, 5 Ves. 877; Crispell v. Dubois, 4 Barb. 393; Wright v. Vanderplank, 2 K. & J. 1; 8 De G., M. & G. 133.

(l) Parkam v. McCravy, 6 Rich. Eq. 114.

(m) Perry v. Craig, 3 Mo. 516; Locker v. Armstrong, 2 Dev. & B. 174; Maxwell v. Kennedy, 8 How. 210; Roberts v. Tunstall, 4 Hare, 357.

(n) Thompson v. Finch, 22 Beav. 316; 8 De G., M. & G. 560.

(o) Hanchett v. Briscoe, 22 Beav. 496.

nave actual knowledge of the breach of trust before acquiescence can be inferred, and it is not the duty of the *cestui que trust* to make inquiry.(*p*) Nor can a *cestui que trust* sue until his interest falls into possession.(*q*)

　　*Chicago.*                                        ADELBERT HAMILTON.

(*p*) Thompson v. Finch, 22 Beav. 325; 8 De G., M. & G. 560; Life Ass'n of Scotland v. Siddall, 3 De G., F. & J. 73; Provost v. Gratz, 6 Wheat. 481; Mellish's Estate, 1 Pars. Eq. 436; Beeson v. Beeson, 9 Barr. 300.

(*q*) Knight v. Bower, 2 De G. & J. 421, 413; Life Ass'n of Scotland v. Siddall, 3 De G., F. & J. 72.